# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | No. 4:23-CR-00159-02 |
| v. | | (Chief Judge Brann) |
| KATRINA MACLEAN, | | |
| Defendant. | | |

## MEMORANDUM OPINION

### JULY 22, 2025

> I collected bones from charnel-houses and disturbed, with profane fingers, the tremendous secrets of the human frame . . . . The dissecting room and the slaughter-house furnished many of my materials; and often did my human nature turn with loathing from my occupation, whilst, still urged on by an eagerness which perpetually increased, I brought my work near to a conclusion.[1]

*    *    *

Katrina Maclean was indicted on June 13, 2023, for violations of 18 U.S.C. § 371, conspiracy to commit an offense against the United States, and 18 U.S.C. § 2314, interstate transportation of stolen property. The charges' mundanity belies the gruesome nature of Maclean's crimes, for the true allegation is that she was a key player in an interstate market for stolen human remains. The disconnect between the charges and the alleged conduct is the basis of the pending motion to dismiss the indictment. Ms. Maclean contends that her actions are not prohibited by section 2314 because a centuries-old common law rule holds that human remains are not property.

---

[1] Mary Shelley, *Frankenstein; or, The Modern Prometheus* 42 (Borders Classics 2006) (1818).

Maclean is incorrect as a matter of law and historical practice. The core principle governing the treatment of bodies, unwavering for centuries, is that human remains should be treated with great respect or even sanctity, whether from a religious or naturalistic perspective.[2] As the law has developed, courts have been increasingly open to accepting that the human body may be considered property if such an approach is necessary to promote that principle. Moreover, Western culture has experienced a slow but steady development toward commodification of the human body, and has viewed such practices with varying and shifting measures of abhorrence.[3] Ms. Maclean may not wield the reverence our society has for the dead as a shield to protect her from the consequences of behavior that her supporting sources would view as sacrilege.

Human remains can be understood as "goods" pursuant to 18 U.S.C. § 2314, and the motion to dismiss the indictment is denied.

---

[2]    *See* Samuel B. Ruggles, *An Examination of the Law of Burial in a Report to the Supreme Court of New-York* 38 (1856) ("The deep-seated, fundamental idea of human burial, lies in the mingling of our remains with the mother earth."); Percival E. Jackson, *The Law of Cadavers and of Burial and Burial Places* 4-14 (1st ed. 1937); *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 167-68 (2004) ("Burial rites or their counterparts have been respected in almost all civilizations from time immemorial. . . . They are a sign of the respect a society shows for the deceased and for the surviving family members.").

[3]    Although I focus on the Anglo-American tradition for purposes of drawing on relevant precedent, it is worth noting that the general revulsion toward cadaveric trade is more or less transculturally ubiquitous. *See* Morris Tidball-Binz, United Nations Human Rights Council, *Protection of the Dead: Report of the Special Rapporteur on Extrajudicial, Summary, or Arbitrary Executions*, ¶¶ 7-8 (April 25, 2024); Russell Scott, *The Body as Property* 3 (1981) ("In contrast to the United States, European nations outside the Communist bloc are virtually unanimous in treating as illegal the sale and purchase of human body parts for profit.").

## I.    BACKGROUND

On June 13, 2023, a grand jury in the United States District Court for the Middle District of Pennsylvania returned a five-count indictment charging Katrina Maclean and three alleged co-conspirators, Cedric Lodge, Denise Lodge, and Joshua Taylor, with a collective count of conspiracy to commit an offense against the United States (Count 1) and one count of interstate transportation of stolen property each (Count 2 (C. Lodge); Count 3 (Maclean); Count 4 (Taylor); Count 5 (D. Lodge)).[4]

The indictment alleges that Cedric Lodge, who was employed as the Manager of the Harvard Medical School ("HMS") Morgue, stole human remains from his employer including "heads, brains, skin, [and] bones."[5] He took the stolen remains to his home in New Hampshire where he and his wife Denise used social media to market the parts to potential buyers.[6] Katrina Maclean and Joshua Taylor were clients of the Lodges.[7] After agreeing to a purchase price, the Lodges shipped remains to Maclean, Taylor, and others through the United States Postal Service or other shippers.[8] Furthermore, Cedric occasionally opened the HMS Morgue as a macabre market, allowing Maclean and Taylor to browse through the corpses to "choose what remains to purchase."[9]

---

[4]    Doc. 1 (Indictment).
[5]    *Id.* ¶¶ 17-18.
[6]    *Id.* ¶¶ 18-19.
[7]    *Id.* ¶ 20.
[8]    *Id.*
[9]    *Id.* ¶ 21.

Maclean resold the remains she sourced from Lodge through her brick-and-mortar storefront—"Kat's Creepy Creations"—and online to buyers from multiple states.[10] One of her clients was Jeremy Pauley, a defendant before this Court in a related case.[11] Maclean shipped or transported the stolen remains interstate to those buyers, including into this District for delivery to Pauley.[12] The indictment specifically alleges that Maclean purchased two dissected faces from Cedric Lodge for $600, and sourced and shipped multiple pieces of human skin to Pauley.[13] Pauley tanned the skin and returned some of it to Maclean, who paid for Pauley's services with additional skin pieces.[14] Pauley also sent an $8,800 payment to Maclean via PayPal for human remains.[15]

Following a federal investigation, grand juries returned several indictments charging various individuals for their participation in the black market for stolen human remains.[16] Maclean was charged with interstate transportation of stolen property and conspiracy to do the same.[17] On March 3, 2025, Maclean moved to

---

[10]  *Id.* ¶¶ 5, 22.

[11]  *Id.* ¶ 22; *see United States v. Pauley*, No. 23-CR-0163 (M.D. Pa.).

[12]  Doc. 1 ¶ 22.

[13]  *Id.* ¶¶ 25, 26, 28.

[14]  *Id.* ¶¶ 26-28.

[15]  *Id.* ¶ 30.

[16]  *See, e.g.*, Doc. 1; Indictment, *United States v. Scott*, No. 23-CR-0101 (E.D. Ark. Apr. 5, 2023), Doc. 3; Indictment, *United States v. Lampi*, No. 23-CR-0162 (M.D. Pa. June 13, 2023), Doc. 1; *cf.* Information, *United States v. Pereyra*, No. 24-CR-0130 (M.D. Pa. May 15, 2024); Information, *United States v. Pauley*, No. 23-CR-0163 (M.D. Pa. June 14, 2023), Doc. 1;

[17]  18 U.S.C. § 2314 (interstate transportation of stolen property); 18 U.S.C. § 371 (conspiracy).

dismiss the indictment.[18] Taylor joined in Maclean's motion, and Cedric Lodge submitted his own motion to dismiss on similar grounds.[19] Taylor and Lodge have both pled guilty since the motions were filed.[20] Maclean, however, has persisted, and her motion is now ripe for disposition.

## II.    LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a criminal defendant may move to dismiss her indictment for "failure to state an offense."[21] Such a challenge is generally mounted in one of two ways: a defendant may argue that "an indictment is insufficient [because] it fails to charge an essential element of the crime"; or she "may . . . claim that [the] indictment fails to state an offense on the basis that the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."[22] In reviewing whether the indictment states an offense under the applicable statute, the Court assumes the truth of the Government's factual allegations.[23]

---

[18]  Doc. 111 (Mot. to Dismiss).

[19]  Docs. 113 (Taylor Notice to Join), 114 (C. Lodge Mot. to Dismiss).

[20]  Docs. 133 (Taylor Guilty Plea), 138 (C. Lodge Guilty Plea). Given their pleas, Taylor's request to join this motion and Lodge's separate motion are DENIED as moot.

[21]  Fed. R. Crim. P. 12(b)(3)(B)(v).

[22]  *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (quoting *United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013)) (internal citation omitted).

[23]  *Stock*, 728 F.3d at 299 (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012)).

## III.    DISCUSSION

Maclean raises three points in support of her motion to dismiss the indictment. First, she contends that human remains are not "goods, wares, merchandise, securities, or money," pursuant to 18 U.S.C. § 2314, and asserts that her conduct is therefore not actionable, regardless of whether the remains in this case were stolen.[24] Second, she argues that, even if they are "goods, wares, merchandise, securities, or money," the remains at issue do not have a value of $5,000 and thus fall short of the statute's jurisdictional amount requirement.[25] And third, Maclean questions whether the evidence presented to the grand jury was sufficient to indict her, and asks for either dismissal of the case or access to the record of those proceedings.[26]

### A.    Are Human Remains "Goods, Wares, Merchandise, Securities, or Money"?

When interpreting a statute, courts "must begin with the statutory text."[27] In doing so, the goal is to determine "the ordinary public meaning of its terms at the time of its enactment."[28] That result is achieved by "orient[ing] ourselves to the time of the statute's adoption . . . and . . . examining the key statutory terms in turn before assessing their impact on the case[] at hand and then confirming our work against

---

24    Doc. 112 (Brief in Supp.) at 3-9.

25    *Id.* at 9-11.

26    *Id.* at 11-14.

27    *Khan v. Att'y Gen.*, 979 F.3d 193, 197 (3d Cir. 2020) (quoting *A.A. v. Att'y Gen.*, 973 F.3d 171, 180 (3d Cir. 2020)).

28    *Id.* at 198 (quoting *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020)); *Knowles v. Temple Univ.*, 109 F.4th 141, 143 (3d Cir. 2024) (quoting *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013)).

. . . precedents."[29] After going back in time, the Court looks to contemporaneous dictionaries to get an idea of relevant terms' meaning.[30] With that understanding in hand, the Court should situate it in "the specific context in which that language is used, and the broader context of the statute as a whole."[31] If this view of the text provides "plain and unambiguous meaning with regard to the particular dispute in the case[, the] inquiry must cease."[32]

Section 2314 of Title 18 of the United States Code makes it a criminal offense to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."[33] The modern statute was enacted in 1948 as part of the United States Congress's large-scale revision of the Federal Criminal Code.[34] The relevant provision of the 1948 statute was

---

[29] *Bostock*, 590 U.S. at 655.

[30] *Knowles*, 109 F.4th at 143 (citing *Pa., Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 647 F.3d 506, 511 (3d Cir. 2011)); *see Khan*, 979 F.3d at 200 (citing dictionary definitions of "commit" from 1992, 1993, and 1995); *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 938-39 (2025) (citing dictionary definitions of "injure" from 1969 and 1971).

[31] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)); *see Gundy v. United States*, 588 U.S. 128, 141 (2019) (plurality) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

[32] *Robinson*, 519 U.S. at 340.

[33] 18 U.S.C. § 2314.

[34] An Act: To revise, codify, and enact into positive law, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure," Pub. L. No. 80-772, ch. 645, § 2314, 62 Stat. 683, 806 (1948); *see* Sen. John L. McClellan, *Codification, Reform, and Revision: The Challenge of a Modern Federal Criminal Code*, 1971 Duke L.J. 663, 683-85 (1971).

essentially a recodification of the 1934 National Stolen Property Act ("NSPA").[35] The core provisions of today's statute are largely unchanged from its 1934 form, and the operative terms "goods, wares, [and] merchandise" have been a constant throughout the statute's life.[36]

The statute itself does not define "goods."[37] The 1910 edition of Black's Law Dictionary defined "goods," in the contractual context, as "not so wide as 'chattels'[;] . . . inanimate objects . . . not includ[ing] animals or chattels real."[38] Referring to "chattels" provides a bit more illumination: "[a]n article of personal property; any species of property not amounting to a freehold or fee in land."[39] Combining the two, Black's defines "goods" as "inanimate articles of personal property." A 1934-copyrighted version of the Second Edition, unabridged, of Merriam-Webster's New International Dictionary of the English Language defined "goods" as "wares; commodities; chattels; . . . In law, a comprehensive name for almost all personal property as distinguished from land or real property."[40] And the

---

[35] National Stolen Property Act, Pub. L. No. 73-246, ch. 333, 48 Stat. 794 (1934); *see Dowling v. United States*, 473 U.S. 207, 218-19 (1985).

[36] § 2314, 62 Stat. at 806 (making it a crime to "knowingly transport[] in interstate or foreign commerce any goods, wares, or merchandise, securities, or money, of the value of $5,000 or more theretofore stolen, converted, or taken by fraud"); § 3, 48 Stat. at 794 (making it a crime to "transport or cause to be transported in interstate or foreign commerce any goods, wares, or merchandise, securities, or money, of the value of $5,000 or more theretofore stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken").

[37] *See* 18 U.S.C. § 2311.

[38] *Goods*, Black's Law Dictionary (2d ed. 1910).

[39] *Chattels*, Black's Law Dictionary (2d ed. 1910).

[40] *Good*, Merriam-Webster's New International Dictionary of the English Language (2d ed. 1937).

1933 Supplemental publication of the First Edition of the Oxford English Dictionary offers the following relevant definitions of "goods": "property or possessions; now in more restricted sense, movable property," and "saleable commodities, merchandise, wares."[41] Given these definitions' frequent use of the statutory terms "merchandise" and "wares," it is unsurprising that those terms' definitions are substantively indistinct and often refer back to "goods."[42] Importantly, these terms all refer to physical items possessed as property and offered for sale.

Looking to statutory context, the "property" definition makes sense. "Goods, wares, [and] merchandise" appear together as a list—one distinctly defined in Black's as: "[a] general and comprehensive designation of such chattels as are ordinarily the subject of traffic and sale."[43] Applying the principle of *noscitur a sociis*—"a word is known by the company it keeps"—erases any doubt that the statute employs "goods, wares, [and] merchandise" to mean saleable personal property.[44] Furthermore, the statute's title—the National Stolen *Property* Act—

---

[41]  *Good*, The Oxford English Dictionary (1st ed. Supp. 1933).

[42]  *Merchandise*, The Oxford English Dictionary (1st ed. Supp. 1933) ("The commodities of commerce; movables which are or may be bought and sold," and "A kind of merchandise; a saleable commodity, an article of commerce."); *Ware*, The Oxford English Dictionary (1st ed. Supp. 1933) ("Articles of merchandise or manufacture; the things which a merchant, tradesman, or pedlar [sic], has to sell; goods, commodities").

[43]  *Goods, wares, and merchandise*, Black's Law Dictionary (2d ed. 1910); *see United States v. Seagraves*, 265 F.2d 876, 880 (3d Cir. 1959) (adopting this definition (citing *Goods, wares, and merchandise*, Black's Law Dictionary (4th ed. 1951)) when interpreting 18 U.S.C. § 2314).

[44]  *Yates v. United States*, 574 U.S. 528, 543 (2015) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

strongly indicates that it is intended to cover property.[45] The list also appends "securities [and] money," further expanding the reach of covered items to, essentially, any moveable item or instrument of inherent or constructive value.[46] The rest of the statute confirms this reading. The *actus reus*—interstate transportation— requires a moveable item, as distinct from real property.[47] The *mens rea*— knowledge that the items were *stolen*—affirms that reading.[48] And, finally, the minimum value of $5,000 establishes that the items must be valuable.

Turning next to the meaning of "property," Black's defines the term as "rightful dominion over external objects; ownership; the unrestricted and exclusive right to dispose of the substance of a thing in every legal way, to possess it, to use

---

[45] 48 Stat. 794 (emphasis added); *see* Scalia & Garner, *supra* note 31, at 221-24.

[46] *See Security*, Black's Law Dictionary (2d ed. 1910) ("Personal Security. . . . (2) Evidences of debt which bind the person of the debtor, not real property . . . Public Securities. Bonds, notes, certificates of indebtedness, and other negotiable or transferable instruments evidencing the public debt of a state or government."); *Money*, Black's Law Dictionary (2d ed. 1910) ("'Money' is a generic term, and embraces every description of coin or bank-notes recognized by common consent as a representative of value in effecting exchanges of property or payment of debts.").

[47] *See Dowling*, 473 U.S. at 216.

[48] *Id.*; *Steal*, Black's Law Dictionary (2d ed. 1910) (analogizing to "theft" and "larceny," but noting that "in popular usage, 'stealing' seems to be a wider term than 'larceny,' inasmuch as it may include the unlawful appropriation of things which are not technically the subject of larceny, *e.g.* immovables"); *Theft*, Black's Law Dictionary (2d ed. 1910) ("An unlawful felonious taking away of another man's movable and personal goods against the will of the owner."); *Larceny*, Black's Law Dictionary (2d ed. 1910) ("The wrongful and fraudulent taking and carrying away by one person of the mere personal goods of another from any place, with a felonious intent to convert them to his (the taker's) use, and make his property, without the consent of the owner."); *see United States v. Smith*, 686 F.2d 234, 241-43 (5th Cir. 1982) ("Without question, the general dictionary definition of the phrase 'stolen, converted, or taken by fraud' implicates the removal or taking possession of a tangible item that is owned by or in the possession of someone else.").

it, and to exclude every one else from interfering with it."[49] "The word is also commonly used to denote any external object over which the right of property is exercised. In this sense it is a very wide term, and includes every class of acquisitions which a man can own or have an interest in."[50] Notably, however, the right of property is subject to limitations imposed "by the laws of the land."[51]

With this review complete, it appears that the statute's textual meaning is plain and facially unambiguous: "goods, wares, and merchandise" are any moveable inanimate objects of value capable of being saleable personal property.[52]

Maclean argues for a slightly different interpretation.[53] She contends that the Court should directly apply the United States Court of Appeals for the Third Circuit's interpretation of the statute from *United States v. Seagraves*, in which the court concluded that "goods, wares, and merchandise" meant "such personal property or chattels as are ordinarily a subject of commerce."[54] She divides this definition into a two-part test, asking (1) whether the item is "a tangible object in the

---

[49]  *Property*, Black's Law Dictionary (2d ed. 1910); *Property*, The Oxford English Dictionary (1st ed. Supp. 1933) ("[T]he right . . . to the possession, use, or disposal of anything (usually of a tangible material thing); ownership, proprietorship."); *Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991) (describing property as a "bundle of rights" including "the rights to possess, to use, to exclude, to profit, and to dispose.").

[50]  *Property*, Black's Law Dictionary (2d ed. 1910); *Property*, The Oxford English Dictionary (1st ed. Supp. 1933) ("[A] thing or things belonging to or owned by some person or persons.").

[51]  *Property*, Black's Law Dictionary (2d ed. 1910).

[52]  *See United States v. Yijia Zhang*, 995 F. Supp. 2d 340, 348 (E.D. Pa. 2014) (holding that "the most natural reading of 'goods, wares, and merchandise' is personal property or chattels that 'have some sort of tangible existence.'" (quoting *Smith*, 686 F.2d at 241).

[53]  *See* Doc. 112 at 4-5.

[54]  *Seagraves*, 265 F.2d at 880.

nature of personal property or chattels," and (2) whether it is "ordinarily . . . the subject of commerce."[55] While step one of that test aligns with the Court's interpretation, step two appears to establish a narrower formulation of the phrase than the Court's reading, which includes any potentially saleable item. But a review of precedent demonstrates that this is really a distinction without a difference.[56] I will start there before turning back to the property issue.

### 1.    Are Human Remains Saleable or "Ordinarily . . . the Subject of Commerce"?

As the United States Court of Appeals for the Ninth Circuit explained when considering different Circuits' application of the *Seagraves* standard in *United States v. Weinstein*,[57] the "ordinarily the subject of commerce" phrase "has been given a broad meaning."[58] After reviewing cases holding that rarely sold items including "documents containing secret chemical formulations," "geophysical maps," "blank airline tickets," and "blank Ticketron tickets to concerts," are all "within section 2314," the panel concluded that "[i]t is apparent that if the property has value and

---

[55]    Doc. 112 at 5 (quoting *Smith*, 686 F.2d at 241).

[56]    The Court is also hesitant to overread the *Seagraves* test as a firm, formal requirement given that it simply applied a definition explaining the "general" meaning of the entire phrase, *Seagraves*, 265 F.2d at 880 (citing *Goods, wares, and merchandise*, Black's Law Dictionary (4th ed. 1951)), and the fact that the narrower definition would seem to conflict with Congress's choice to extend the crime to cover "*any* goods, wares, merchandise, securities, or money." 18 U.S.C. § 2314 (emphasis added); *see Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023) (collecting Supreme Court authority for the proposition that "any" suggests "expansive" meaning).

[57]    834 F.2d 1454, 1463 (9th Cir. 1987) (citing *United States v. Greenwald*, 479 F.2d 320 (6th Cir. 1973) and *Seagraves*, 265 F.2d 876).

[58]    *Id.* (citations omitted).

can be sold, even on a thieves market, that it is considered to be 'ordinarily the subject of commerce.'"[59]

The reasoning of those cases confirms the Ninth Circuit's conclusion. In *Seagraves* itself, the Third Circuit, relying on the presence of "evidence that maps of the type here involved are frequently sold," found that those maps were "goods or wares or merchandise within the terms of the Act" notwithstanding the fact that they were "of a specialized nature."[60] In *United States v. Greenwald*, the United States Court of Appeals for the Sixth Circuit held that documents containing secret chemical formulae were "goods, wares or merchandise" "given an established, viable, albeit limited, market."[61] And in cases where courts have found that items were not "goods, wares, and merchandise," they have done so both because the items were not obviously bought or sold *and* "the Government has not come forward or proffered any evidence to that effect."[62]

Based on the same precedent, the Honorable Deborah A. Batts, writing for the United States District Court for the Southern District of New York, has explained that "articles covered by § 2314 fall into two categories. The first is articles that have intrinsic saleability. . . . The second category is comprised of those articles not

---

[59]   *Id.* (citations omitted).
[60]   *Seagraves*, 265 F.2d at 880.
[61]   479 F.2d at 322.
[62]   *In re Vericker*, 446 F.2d 244, 248 (2d Cir. 1971); *see Am. Cyanamid Co. v. Scharff*, 309 F.2d 790, 796 (3d Cir. 1962).

plainly or obviously saleable, for which a market must be affirmatively proven at trial by the Government."[63] My reasoning accords with Judge Batts's, and the Government has met its burden to establish the existence of a market for human remains at this stage of the litigation. The indictment plainly alleges the existence of an extensive network of trade in body parts,[64] and the Court must accept those allegations as true.[65] Moreover, Maclean admits that this market exists, and that she is a part of it.[66] The distinction between licit and illicit markets makes no difference: both are actionable under section 2314.[67]

Accordingly, the Court concludes that human remains meet the "ordinarily the subject of commerce" standard. That leaves the "property" element of the definition of "goods, wares, and merchandise," which is a much closer issue.

## 2.    Are Human Remains Property?

Although I have determined that the text of the statute is unambiguous in a general sense, the true question in statutory interpretation is "whether the language has a plain and unambiguous meaning *with regard to the particular dispute in the*

---

[63]    *United States v. Kwan*, No. 02-CR-0241, 2003 WL 22973515, at *5 (S.D.N.Y. Dec. 17, 2003).

[64]    *See, e.g.*, Doc. 1 ¶¶ 16, 19, 20, 22, 23.

[65]    *United States v. Menendez*, 831 F.3d 155, 159 (3d Cir. 2016).

[66]    Doc. 112 at 1 ("[Maclean] is part of a legal, nationwide oddities community that collects body parts . . . that oddities market is extensive and not uncommon."); *see* Brian Grow & John Shiffman, *Cashing in on the Donated Dead: The Body Trade*, Reuters (Oct. 24, 2017); Michelle Goodwin, *Empires of the Flesh: Tissue and Organ Taboos*, 60 Ala. L. Rev. 1219 (2009); *United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024).

[67]    *United States v. Bottone*, 365 F.2d 389, 393 (2d Cir. 1966) (citing *Seagraves*, 265 F.3d at 880); *Weinstein*, 834 F.2d at 1463.

*case*."[68] Here, the dispute is whether human remains are "tangible object[s] in the nature of personal property or chattels,"[69] or, in my terms, moveable inanimate objects capable of being personal property. More specifically, because this case focuses on Maclean's actions, the issue is whether human remains can be property when possessed and used in commerce by a person with no relation to the decedent.[70] The statute does not clearly answer that subsidiary legal question. Maclean argues that human remains cannot legally be property, and so are not goods, wares, or merchandise.[71]

Given the textual ambiguity as to the dispute in this case, the Court turns to additional tools of statutory construction to resolve it. "'[W]here Congress uses a common-law term in a statute, we assume the 'term . . . comes with a common law meaning, absent anything pointing another way.'"[72] In such a case, the Court interprets the statute's application by reference to "the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."[73] Moreover, the Court should "assume Congress legislated against [the relevant]

---

[68]   *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson*, 519 U.S. at 340) (emphasis added).

[69]   *Smith*, 686 F.2d at 241.

[70]   *Cf. Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 385 (Tex. 2012).

[71]   Doc. 112 at 6-8.

[72]   *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 101 (2011) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 (2007)); *see United States v. Turley*, 352 U.S. 407, 411 (1957).

[73]   *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)); *see Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.").

background of law, scholarship, and history."[74] Here, where the borrowed term is defined by reference to an entire "body of learning," i.e., property law, it "brings [all of] the old soil with it."[75] So I review the law of property as it relates to human remains.

I conduct this review in three stages. First, I address the origins of the concept that human remains are not property, fleshing out its ecclesiastical roots and describing its logical inconsistencies. Second, I turn to historical developments like dissection and body-snatching that challenged the no-property rule's underpinnings and consider the rule's development in the American and post-ecclesiastical English legal systems. These changes led to the weakening and substantial rejection of the no-property rule in America by the time of the NSPA's passage in 1934, and I therefore conclude that an ordinary person at the time would understand dead bodies to be the subject of sufficient property rights to make their theft actionable under section 2314. Third, I consider legal and social shifts from the passage of the NSPA to today, including courts' apparent return to the no-property rule in certain contexts and the rise of organ transplantation and newfound value in body parts, and conclude that the common law today would recognize that human remains are property when

---

[74] *Favish*, 541 U.S. at 169.

[75] *Sekhar*, 570 U.S. at 733 (quoting Felix Frankfurter, J., *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

used as such by third parties with no relation to the decedent. Accordingly, I reject Maclean's argument in full.

### a.    *Nullius in Bonis*: The Origins of the No-Property Rule

Many cases and commentators state the broad premise that "[i]t is a well-recognized, and almost universal, rule of law that a dead human body is not property, and that there is no true proprietary interest or right of property therein."[76] This rule stems from the general regard of "the human body . . . as an object of special reverence, seen as something given from on high, dissimilar to all other phenomena of the material world."[77] In early English law, a corpse's unique status rendered it "*nullius in bonis*," or "among the property of no person."[78] More precisely, disposition of a cadaver "belong[ed] to Ecclesiastical cognizance,"[79] meaning that the process of handling a corpse until and through interment was "governed by the rules and canons of the church."[80] From the limited historical record, Samuel Ruggles, in his invaluable report on the relocation of a cemetery during the widening

---

[76]   George H. Weinmann, Nat'l Rsch. Council, *Survey of the Law concerning Dead Human Bodies* 21 (1929).

[77]   Arseny Shevelev & Georgy Shevelev, *The Nature of the Right in a Dead Body Revisited: A Study in Comparative Legal Ideas*, 83 La. L. Rev. 1361, 1367 (2023) (citing Cyril Poison & Thomas Marshall, *The Disposal of the Dead* 11-15 (3d ed. 1979)).

[78]   Edward Coke, *The Third Part of the Institutes of the Laws of England: Concerning High Treason, and other Pleas of the Crown, and Criminal Causes* 203 (1st ed. 1644); *see Nullius in bonis*, Black's Law Dictionary (2d ed. 1910).

[79]   Coke, *supra* note 78, at 203; *see Pettigrew v. Pettigrew*, 56 A. 878, 879 (Pa. 1904); *Pierce v. Proprietors of Swan Point Cemetery*, 10 R.I. 227, 235 (1872).

[80]   Thomas M. Chattin Jr., Note, *Property Rights in Dead Bodies*, 71 W. Va. L. Rev. 377, 377 (1969); Jackson, *supra* note 2, at 116.

of Beekman Street in New York City, surmised that jurisdiction over burials became associated with the Church during the reign of Pope Gregory the Great (590-604 A.D.).[81] The theory of the ecclesiastical law of burial in turn derived from the Christian biblical idea of the resurrection of "mortal bodies" that will come at the Last Judgment.[82] It would be safe to say that the *nullius in bonis* rule was rooted in the belief that "the body was the temple of the Holy Ghost from which at his death a man was temporarily to be separated," and that it was the deceased's right to have her body preserved for her spirit's eventual return.[83]

From a more practical perspective, Ruggles explains that, "from the sixth century to the thirteenth," the Church exerted "earnest efforts and [achieved] all but uninterrupted progress, not only in strengthening its proper spiritual power, but in obtaining the exclusive temporal, judicial cognizance of all matters touching the ecclesiastical edifices and their appendages, and especially their places of burial."[84] Ultimately, this consolidation of power resulted in both "exclusive . . . executive

---

[81] Ruggles, *supra* note 2, at 35-36; *see* Jackson, *supra* note 2, at 14.

[82] *Romans* 8:11 (King James) ("But if the Spirit of him that raised up Jesus from the dead dwell in you, he that raised up Christ from the dead shall also quicken your mortal bodies by his Spirit that dwelleth in you."); *see* Shevelev & Shevelev, *supra* note 77, at 1368-69; Tanya D. Marsh, *The Law of Human Remains* 3-5 (2016).

[83] *In re Johnson's Estate*, 7 N.Y.S. 2d 81, 84 (N.Y. Sur. Ct. 1938) (discussing the foundations of Lord Chief Justice Coke's rule); *see* Scott, *supra* note 3, at 13; Jackson, *supra* note 2, at 34 ("[M]ore modern religious faiths require interment, and decent interment, in preparation for a resurrection to come."); *id.* at 116 ("The spirit departed to the realms of the supernatural; the body was held by the divine agent to await resurrection.").

[84] Ruggles, *supra* note 2, at 36.

[and] judicial" power over dead bodies.[85] "It was executive, in taking the body into their actual, corporeal possession, and practically guarding its repose in their consecrated grounds; and it was judicial, as well in deciding all controversies involving the possession or the use of holy places . . . [and] in adjudicating who should be allowed to lie in consecrated earth, and, in fact, who should be allowed to be interred at all."[86] The Church gained complete "authority over the dead" by the thirteenth century, and secular courts "were left to confine themselves to the protection of the monument and other external emblems of grief, erected by the living."[87]

Lord Chief Justice Coke's *nullius in bonis* rule directly followed from this historical trend. While "[t]he buriall [sic] of the Cadaver . . . is *nullius in bonis*, and belongs to the Ecclesiastical cognizance, but as to the monument, action is given (as hath been laid) at the Common law for defacing thereof."[88] Sir William Blackstone's restatement from a century later followed the same mold. In noting that "a prosecution for theft might be carried on without the intervention of the owner . . .

---

[85]  *Id.* at 37; Jackson, *supra* note 2, at 23 ("As the church drew to itself the power of adjudication concerning its clericals, it similarly took exclusive cognizance of the customs and practices concerning sepulture as religious rites and acts. And as a corollary, it assumed the right to control, under precepts of canonical law, the place of final abode of the mortal tenement.").

[86]  Ruggles, *supra* note 2, at 37; *see Pierce*, 10 R.I. at 326 ("In England, by their ecclesiastical law, by which this subject was regulated, every person (with exception of traitors, &c.) had a right to be buried in the parish churchyard. . . . The whole was under the direction of the ordinary, and was of ecclesiastical cognizance. And once buried, the body could not be removed without license from the ordinary.").

[87]  Ruggles, *supra* note 2, at 40.

[88]  Coke, *supra* note 78, at 203.

[as in] the case of stealing a shrowd [sic] out of a grave . . . stealing the corpse itself, which has no owner, (though a matter of great indecency) is no felony, unless some of the graveclothes be stolen with it."[89] As Ruggles explains, these rules stated that there was no property in human remains because "[i]n the English jurisprudence, a corpse . . . was taken and appropriated by the Church."[90]

Ecclesiastical cognizance over cadavers was not absolute, however. At least one statute asserted a secular role in protecting human remains. In 1603-04, following the unification of the Scottish and English crowns, King James I enacted "An Act against Conjuration, Witchcraft, and dealing with evil and wicked Spirits."[91] That statute made it a criminal offense to, among other things, "take up any dead man, woman, or child, out of his, her, or their grave, or any other place where the dead body resteth; or the skin, bone, or any other part of any dead person, to be imployed, or used in any manner of Witchcraft, Sorcery, Charme, or Inchantment."[92] The offense was punishable by "paines of death as a Felon or

---

[89]   4 William Blackstone, *Commentaries on the Laws of England* 236 (1st ed. 1769).

[90]   Ruggles, *supra* note 2, at 42; Jackson, *supra* note 2, at 116 ("The church took the body to itself. It held that a corpse was appropriated by it, by divine service and consecrated burial."); Marsh, *supra* note 82, at 5 ("Pursuant to ecclesiastical doctrine and law, the Church took 'possession' of the body after burial and protected it so long as it remained in consecrated ground.").

[91]   1 Jas. I, c. 12.

[92]   *Id.* For those with passing interest, the Act also made it a crime to "use, practise, or exercise any invocation or conjuration of any evil and wicked spirit . . ., consult, covenant with, entertaine, imploy, feed, or reward any evil and wicked spirit, to or for any intent or purpose . . ., [or] use, practise, or exercise, any Witchcraft, Incantment, Charme or Sorcery, whereby any person shall be Killed, Destroyed, Wasted, Consumed, Pined, or Lamed, in His or Her body, or any part therof." *Id.*

Felons, and [loss of] the priviledge and benefit of Clergy and Sanctuary."[93] Furthermore, the secular common law *did* recognize corpses as property in the limited sense that "before 1804 in England one could . . . arrest a dead body for debt, as witness the attachment of the body of Dryden, the poet, in 1700, and that of Sir Bernard Taylor in 1784."[94]

Notably, a critical underpinning of the broad-sweeping *nullius in bonis* rule was the idea that "[t]he body in a commercial sense was devoid of market value."[95] Thus, Lord Chief Justice Coke and Sir Blackstone may have struggled to comprehend any reason to possess a cadaver that did not strike them as inherently prohibited.[96] It seems then that the *nullius in bonis* rule functioned much less as a prescriptive pronouncement of individual rights than as a descriptive acknowledgment of the practical circumstances of the time. Given the Church's dominance over burial and repose and the lack of any productive use for cadavers, *nullius in bonis* was essentially secular law's capitulation to reality.[97] As

---

[93] *Id.*

[94] Jackson, *supra* note 2, at 119.

[95] *Johnson's Estate*, 7 N.Y.S. 2d at 84; *see* Ruggles, *supra* note 2, at 54 ("It will be seen that much of the apparent difficulty of the subject, arises from a false and needless assumption, in holding that nothing is property that has not a pecuniary value."). Of course, this assumption is inconsistent with the law's permissive attitude toward using a body as collateral against a debt.

[96] It seems telling that the only use the legislature could apparently imagine was witchcraft. *See* An Act against Conjuration, Witchcraft, and dealing with evil and wicked Spirits, 1 Jas. I, c. 12.

[97] *See* Jackson, *supra* note 2, at 22 ("Thus the keeping and disposal of the dead, until comparatively recent times . . . were not essentially subjects of material consideration. The governing rules were superstitious or divine precepts; the rites and customs were not of temporal concern but were dictated by the priests of the existing spiritual faiths.").

circumstances and beliefs have changed, however, so too have the conditions that made the no-property rule a viable principle.

Given that the *nullius in bonis* rule was developed in a legal system distinct from the American model, and is steeped in spiritual and explicitly religious considerations, it presents several obvious problems to a modern perspective when practically applied.[98] Take first the simple reality that a cadaver is a physical tangible object. Someone must have custody of it for various periods of time before interment—is not the body then their property in some sense, or is this not at least a right of possession subject to legal limitations? May the custody holder prevent others from taking custody of the body?[99] If so, how is that different than the right to exclude? Next, consider the necessity of deciding where the decedent will be interred.[100] If the right to make that decision lies with the next of kin, as has generally been accepted,[101] how is that distinct from the property right of disposal, even if subject to strict limitations?[102] As Ruggles again elaborates: "If no one has any legal

---

[98]    Ruggles appears to have despised the *nullius in bonis* rule as unenlightened and riddled with contradictions, and he argued forcefully against its adoption in America: "The insolent dogma of the English ecclesiastical law, that a child has no claim, no such exclusive power, no peculiar interest in the dead body of its parent, is so utterly inconsistent with every enlightened perception of personal right, so inexpressibly repulsive to every proper moral sense, that its adoption would be an eternal disgrace to American jurisprudence." Ruggles, *supra* note 2, at 54.

[99]    *Id.* at 43.

[100]   *Id.*

[101]   *See Favish*, 541 U.S. at 167 ("We have little difficulty, however, in finding in our case law and traditions the right of family members to direct and control disposition of the body of the deceased.").

[102]   The limitations include handling the body with respect and not disposing of it in a way "that might be regarded as creating a nuisance, be offensive to the sense of decency, or be injurious

interest in a corpse, no one can legally determine the place of its interment, nor exclusively retain its custody. A son will have no legal right to retain the remains of his father, nor a husband his wife, one moment after death. A father cannot legally protect his daughter's remains from exposure or insult, however indecent or outrageous, nor demand their re-burial if dragged from the grave."[103]

Furthermore, under modern views, the no-property rule was incoherent on its own terms. At the same time as courts were proclaiming a spiritual mandate that there can be no property in a dead body, the governments of which they were a part were sanctioning and engaging in active commerce in *living human beings*.[104] Slavery directly conflicts with the no-property rule[105] and demonstrates the weakness of the rule's theoretical foundations when removed from the racially and religiously discriminatory context in which it was developed. It also illustrates that

---

to the health of the community." Marsh, *supra* note 82, at 41 (quoting *Seaton v. Commonwealth*, 149 S.W. 871, 873 (Ky. 1912)).

[103] Ruggles, *supra* note 2, at 43

[104] *See* Scott, *supra* note 3, at 26-27; Marsh, *supra* note 82, at 14 ("Prior to the enactment of the Thirteenth Amendment to the Constitution of the United States, common law prohibited ownership of all corpses, while statutory law permitted ownership of certain live human beings. As a result, while a slave was alive he was property, but when he died his corpse was not."); Roy Hardiman, *Toward the Right of Commerciality: Recognizing Property Rights in the Commercial Value of Human Tissue*, 34 UCLA L. Rev. 207, 224 (1986) ("While the specter of slavery is offensive, slavery demonstrates the ease with which the human body may be treated as property.").

[105] *Cf.* Michele Goodwin, *Formalism and the Legal Status of Body Parts*, 2006 U. Chi. L. F. 317, 322-23 (2006) (discussing some scholars' fears that abandoning the no-property rule would reopen the possibility of slavery); Michele Goodwin, *The Body Market: Race Politics and Private Ordering*, 49 Ariz. L. Rev. 599, 599 (2007) ("[O]pponents to incentives in organ regimes argue that private ordering in organ procurement would sanction a neoclassical form of slavery.").

the rule is itself a fiction: obviously dead bodies are *capable* of being bought, sold, and owned, just as living bodies were for millennia.

The history and problems of the *nullius in bonis* rule make clear that it is an incoherent legal invention, developed in "a body of law grown up under circumstances differing widely from our own."[106] In our system, "exempt" from "the ecclesiastical element," we were "hardly required to adopt" the "anomalies" it has "birth[ed]."[107] But, several centuries on, the rule has been imported to our shores and here repeated by our courts. I turn next to that development and how the law dealt with the contradictions that arose around the same time with the scientific revolution of anatomical dissection and the attendant problem of bodysnatching.

### b.    Bodysnatching and Burials: *Nullius in Bonis* in the New World

Around the time this nation was founded,[108] the scientific attitude toward cadaveric dissection was in its own revolution. During the development of the *nullius in bonis* rule, with few exceptions "theologians and philosophers considered the material world (including the frail human frame) to be fleeting and unimportant compared to eternity, and the body was therefore not a focus of rigorous study. Anatomical dissection, in particular, was culturally construed as desecration and thus

---

[106] Ruggles, *supra* note 2, at 34.
[107] *Id.* at 34-35.
[108] *See, e.g.*, The Declaration of Independence (U.S. 1776).

prohibited."[109] That belief began to shift in the "eighteenth and most of the nineteenth centuries, . . . [when] the public demanded of practitioners of medicine and surgery a practical knowledge of the anatomic structure of the human body."[110] In the mid-1700s, the University of Pennsylvania began offering the first formal anatomy class in America.[111] With increased dissections came a demand for bodies to dissect, and that need was met by the rise of bodysnatchers. The legal response to the problem of bodysnatching is particularly informative in this case, because it is one of the only historical areas in which lawmakers confronted the prospect of individuals profiting from bodies to which they had no familial connection.

In parallel, the American judiciary, having rejected an ecclesiastical system, and to a lesser extent English secular courts during the decline of ecclesiastical jurisdiction,[112] were forced to confront the impracticality of the no-property rule.

---

[109] S. Ryan Gregory & Thomas R. Cole, *The Changing Role of Dissection in Medical Education*, 287 JAMA 1180, 1180 (2002); *see Commonwealth v. Cooley*, 27 Mass. 37, 40 (1830) ("The reason why cases of [bodysnatching] are not to be found in the earlier reports is very obvious, namely, that the dissection of human bodies was not so extensively practised in former times.").

[110] Linden F. Edwards, *Resurrection Riots During the Heroic Age of Anatomy in America*, 25 Bull. of the History of Med. 178, 178 (1951); Chattin, *supra* note 88, 71 W. Va. L. Rev. at 378.

[111] *See* Aaron D. Tward & Hugh A. Patterson, *From Grave Robbing to Gifting: Cadaver Supply in the United States*, 287 JAMA 1183, 1183 (2002) (dating the course to 1745—a doubtful proposition given that the University's precursors did not have a formal board of trustees until 1749, and the related institution was employed for religious purposes until that point (*see* Thomas Harrison Montgomery, *A History of the University of Pennsylvania from its Foundation to A.D. 1770*, 11, 26-27 (1900))); Elizabeth Fee, *The First American Medical School: The Formative Years*, 385 The Lancet 1940, 1940 (2015) (stating, more believably, that "[i]n 1765, students were admitted to 'anatomical lectures' and a course on 'the theory and practice of physik' at the College of Philadelphia.").

[112] *See* Charles P. Sherman, *A Brief History of Medieval Roman Canon Law in England*, 68 U. Pa. L. Rev. 233, 256-57 (1920); Jackson, *supra* note 2, at 29 ("The repudiation of the

Without a divine basis for enforcing the social mores against mistreatment of corpses and faced with circumstances that would have been inconceivable to Coke and Blackstone,[113] judges struggled to reach publicly acceptable outcomes in cases involving dead bodies under the constraints of common law rules developed to serve a fundamentally different system. Accordingly, courts frequently devised exceptions to or revisions of the no-property rule to avoid socially unacceptable judgments.

### i.    Bodysnatching and Legislative Responses

With the rise in dissections came a new demand for cadavers to dissect.[114] But the earliest laws attempting to meet this demand remained at least partially infected by spiritual beliefs about the need to preserve cadavers. Despite the advancements being made in the medical field, public opinion was still strongly opposed to the practice of dissection.[115] Thus, legislatures permitted only convicted criminals to be remitted to the operating table, and identified dissection as a kind of "supra-capital punishment."[116] For example, in England, the Murder Act of 1752 provided "[t]hat a body of such murderer so convicted shall . . . be immediately conveyed . . . to the

---

ecclesiastical law and of ecclesiastical courts by the American colonies left the temporal courts the sole protector of the dead and the living in their dead." (quoting *Larson v. Chase*, 50 N.W. 238, 238-39 (Minn. 1891)).

[113] Marsh, *supra* note 82, at 14 ("Many problems that exist as a result of the modern application of the doctrine were not issues in the time of Lord Coke and Blackstone.").

[114] Tward & Patterson, *supra* note 111, at 1183; Scott, *supra* note 3, at 5.

[115] Walter Hellerstein, *"Body-Snatching" Reconsidered: The Exhumation of Some Early American Legal History*, 39 Brook. L. Rev. 350, 353 (1972).

[116] Tward & Patterson, *supra* note 111, at 1183; *see* Hellerstein, *supra* note 115, at 353-54 ("[P]resumably, the fear of post-mortem dissection would dissuade potential murderers from carrying into fruition their deadly designs.").

hall of the Surgeons Company . . . [and] shall be dissected and anatomized by the said Surgeons."[117] Burial of murderers was prohibited "unless after such body shall have been dissected and anatomized as aforesaid."[118] Similarly, in 1784, Massachusetts passed "An Act Against Duelling" providing that the body of a person killed in a duel or a person convicted of murder in a duel (after execution) be delivered "to any surgeon or surgeons to be dissected and anatomized."[119] And New York, as part of an effort to prevent bodysnatching (which I will address shortly), granted judges discretion to "add to the judgment" of a death sentence for "murder, arson, or burglary," "that the body of such offender shall be delivered to a surgeon for dissection."[120] The federal government followed suit. The First Congress, in the Crimes Act of 1790, adopted the New York model, permitting judges in murder cases to order "that the body of such offender shall be delivered to a surgeon for dissection."[121]

These punishment-focused laws generated an insufficient supply of cadavers to meet the demand of a proliferation of medical schools.[122] To fill the gap, enterprising individuals began exhuming cadavers and selling them to medical

---

[117] An act for better preventing the horrid crime of murder, 25 Geo. 2 c. 37 § 2.

[118] *Id.* § 5.

[119] An Act Against Duelling, 1 Mass. Gen. Laws ch. 9, § 4 (1784).

[120] An Act to Prevent the Odious Practice of Digging Up and Removing for the Purpose of Dissection, Dead Bodies Interred in Cemeteries or Burial Places, L. 1789, ch 3 (N.Y. Sess. 12) (1789) (later codified at N.Y. Pub. Health. Law §§ 4216-4218).

[121] An Act: For the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 113 § 4 (1790).

[122] Tward & Patterson, *supra* note 111, at 1183.

schools on the black market—a practice dubbed "bodysnatching."[123] The trade was incredibly lucrative: in England, "the sale of just one fully grown cadaver brought up to four guineas, eleven times the average weekly wage."[124] "By the beginning of the nineteenth century, great numbers of bodies were being stolen from graveyards and no corpse was safe from disturbance."[125] "The development of this state of affairs was obviously assisted by the failure of the law to provide practical help beyond some ancient principles protecting graveyards, and a curious common law rule that no one could have property rights in a human corpse."[126] In other words, bodysnatching was a viable enterprise *because of nullius in bonis*. The no-property rule's failure to anticipate a practical use for cadavers created an enormous loophole for these crafty "tradesmen" to exploit, to the outrage of the general public.

From 1765 to 1852, there were "at least a dozen riots" related to bodysnatching in the United States.[127] The most famous, the New York Doctors' Riot of 1788, which was apparently triggered when young boys saw a human limb through the window of the Hospital Society, resulted in destruction of the anatomy

---

[123] Edwards, *supra* note 110, at 178 ("In order to supply the increased demand medical colleges were forced to depend on the services of professional grave robbers, body snatchers, or resurrectionists, as they were variously called."); Scott, *supra* note 3, at 5.

[124] Stephen Ashley Mortinger, *Spleen for Sale:* Moore v. Regents of the University of California *and the Right to Sell Parts of Your Body*, 51 Ohio St. L.J. 499, 501 (citing Scott, *supra* note 3, at 5).

[125] Scott, *supra* note 3, at 5-6.

[126] *Id.* at 6.

[127] Tward & Patterson, *supra* note 111, at 1183; Hellerstein, *supra* note 115, at 351, 355-57.

laboratory and several deaths.[128] New York's legislature responded the next year by enacting its penal dissection law and criminalizing "for the purpose of dissection . . . dig[ging] up, removing or carrying away, any dead human body, which shall have been interred in any cemetery or burial place."[129]

Similarly, in 1824, the local community took up arms against the Yale Medical College when "the body of a young woman was discovered missing from her grave in West Haven, Connecticut, and was subsequently located in the building of the Yale Medical College."[130] Following the riot, the Connecticut legislature passed an "Act to prevent the disinterment of bodies of deceased persons."[131] The law addressed the cadaver demand problem by providing for the bodies of murderers and inmates who died with no known families to be transmitted for anatomical dissection, and directly countered the bodysnatching issue by making it a crime to "open the grave of any deceased person, or the tomb where the body or bodies of any deceased person or persons have been deposited, or . . . remove the body or bodies or remains of any deceased person or persons from their grave, graves, or

---

[128] Hellerstein, *supra* note 115, at 355-57; Tward & Patterson, *supra* note 111, at 1183-84. Among the injured was Federalist Papers co-author and future first Chief Justice of the United States Supreme Court John Jay, who "'got his scull almost crackd' with a rock." Bess Lovejoy, *The Gory New York City Riot that Shaped American Medicine*, SmithsonianMagazine (June 17, 2014), https://www.smithsonianmag.com/history/gory-new-york-city-riot-shaped-american-medicine-180951766/.

[129] An Act to Prevent the Odious Practice of Digging Up and Removing for the Purpose of Dissection, Dead Bodies Interred in Cemeteries or Burial Places, L. 1789, ch 3 (N.Y. Sess. 12) (1789).

[130] Hellerstein, *supra* note 115, at 367.

[131] 1824 Conn. Pub. Acts ch. 16.

place of sepulture, for the purposes of dissection, or any surgical or anatomical experiments, or for any other purpose."[132]

In 1831, Massachusetts moved beyond penal dissection when it passed "An Act More effectually to Protect the Sepulchres of the Dead, and to legalize the Study of Anatomy in certain cases."[133] The law provided for the "surrender" of cadavers "as may be required to be buried at the public expense"—in other words, unclaimed bodies—"to any regular physician . . . to be by said physician to be used for the advancement of the anatomical science."[134] And it outlawed exhuming or "convey[ing] away" bodies without proper authority, punishing such conduct with "solitary imprisonment for a term not exceeding ten days, and by confinement afterwards to hard labor for a term not exceeding one year," or a $2,000 fine and up to two years' "imprisonment in the common jail."[135] Other states thereafter followed the Massachusetts model providing that unclaimed cadavers would be sent for anatomical dissection.[136] In America "by the beginning of the 20th century, cadavers were supplied almost exclusively from unclaimed bodies."[137]

---

[132] *Id.*

[133] 1831 Mass. Acts 574.

[134] *Id.* § 3.

[135] *Id.* § 1.

[136] Tward & Patterson, *supra* note 111, at 1184; Alix Rogers, *Unearthing the Origins of Quasi-Property Status*, 72 Hastings L.J. 291, 320-21 (2020) ("By the early 1880s, fourteen of the thirty-eight states had passed similar laws, and by 1913, with the exception of Louisiana, Alabama, Tennessee and North Carolina, all states with medical schools had laws which permitted medical schools to appropriate the deceased bodies of the indigent poor for dissection.").

[137] *Id.*

The public in England was similarly outraged by the law's failure to protect dead bodies in the face of rampant bodysnatching. The cadavers provided pursuant to the Murder Act of 1752 had failed to meet demand, and, in the early 1800's, Parliament was forced to act following the discovery of several murderous schemes designed to generate bodies for sale.[138] The Burke and Hare murders were exposed in 1828. William Hare and his wife Mary operated a lodging house in Edinburgh, Scotland; William Burke was one of their lodgers.[139] When another of the Hares' lodgers died naturally on November 29, 1827, Burke and Hare decided to sell his body to a nearby medical school.[140] Upon seeing the ease with which they were able to convert the corpse into a handsome profit (£7 10s—well in excess of the £4 the decedent had owed in rent—no questions asked), the men contrived to "creat[e] their own corpses."[141] Over the next year, the conspirators murdered sixteen of their guests and sold their bodies for profit.[142] After they were caught by a guest who discovered a corpse under a heap of straw, Hare confessed and testified against Burke, who was tried for murder, convicted, executed, and publicly dissected at the University of Edinburgh (where his remains are still displayed).[143] Several years later, in 1832, John Bishop and Thomas Williams were tried at London's Old Bailey

---

[138] Scott, *supra* note 3, at 8-10; Tward & Patterson, *supra* note 111, at 1184.
[139] Scott, *supra* note 3, at 9.
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.* at 9-10; *see* University of Edinburgh, *William Burke, Anatomical Museum* (Aug. 5, 2024), https://biomedical-sciences.ed.ac.uk/anatomy/anatomical-museum/collection/people/burke.

for the murder of a 14-year-old Italian immigrant after anatomists became suspicious of injuries around the corpse's head and its complete lack of teeth (a dentist later confirmed that he had bought teeth from the men on the same day).[144] Following their conviction, Bishop and Williams admitted to committing two more murders for the same purpose.[145] Like Burke, Bishop and Williams were publicly executed and dissected.[146]

Parliament passed the Warburton Anatomy Act later that year.[147] Recognizing the ever-increasing demand for cadavers,[148] the Act created a licensure system for doctors and medical schools wishing to practice anatomy, and made it "lawful for any Executor or other Party having lawful Possession of the Body of any deceased Person, and not being an Undertaker or other Party intrusted with the Body for the Purpose only of Interment, to permit the Body of such deceased Person to undergo Anatomical Examination."[149] The Act also permitted relatives of the decedent or the decedent himself to veto an anatomical donation.[150] Finally, the Act repealed the

---

[144] Scott, *supra* note 3, at 11.

[145] *Id.*

[146] *Id.*

[147] 2 & 3 Will. 4 c. 75.

[148] *Id.* ("WHEREAS a Knowledge of the Causes and Nature of sundry Diseases which affect the Body and of the best Methods of treating and curing such Diseases, and of healing and repairing divers Wounds and Injuries to which the Human Frame is liable, cannot be acquired without the Aid of Anatomical Examination: And whereas the legal Supply of Human Bodies for such Anatomical Examination is insufficient fully to provide the Means of such Knowledge.").

[149] *Id.* §§ 1, 7-8.

[150] *Id.* §§ 7-8.

penal dissection provision of the Murder Act of 1752, providing instead that executed murders should "either . . . be hung in Chains, or . . . be buried within the Precincts of the Prison in which such Prisoner shall have been confined."[151] The Act's practical effect was to remand many unclaimed bodies—for which no relatives could be identified to object—for dissection. Parliament followed this act with the Burial Act of 1857, which provided that "it shall not be lawful to remove any Body, or the Remains of any Body, which may have been interred in any Place of Burial, without Licence under the Hand of One of Her Majesty's Principal Secretaries of State, and with such Precautions as such Secretary of State may prescribe as the Condition of such Licence."[152]

Ultimately, these legislative reforms proved effective in curbing the rise of the bodysnatching trade. Once medical schools had a steady, free supply of cadavers, there was simply no incentive to exhume corpses.[153] And although the laws for the most part did not speak in the terms of economics or property,[154] reframing the legislation in that way illustrates lawmakers' recognition of the value in human remains and departure from the no-property rule. Bodysnatching arose from purely organic market circumstances: medical researchers began to see value in studying

---

[151] *Id.* § 16.

[152] 20 & 21 Vict. c. 81 § 25.

[153] Scott, *supra* note 3, at 12 ("The Anatomy Act of 1832 was a simple and completely effective piece of legislation that at one stroke destroyed the trade of the body snatchers.").

[154] At least one state, Florida, specifically banned "buying or selling, or trafficking in, the dead body of any human being." 1872 Fla. Laws 249 ¶ 26 (later codified at Fla. Stat. § 872.01).

anatomy, thereby creating a new demand for cadavers. Bodysnatchers stole (or created) corpses to generate supply sufficient to meet that demand. Governments recognized the utility of the ongoing medical research, but their first attempts at meeting demand were insufficient. In the end, instead of embracing the no-property rule and outlawing anatomy entirely (and inevitably merely driving the sale of human remains deeper into the shadows), governments nationalized the market—one in which they conveniently already had an essentially unlimited and renewable supply of product—prohibited nonstate actors from generating any competing supply, and undercut any private holdouts by making their product free. So although lawmakers did not explicitly state that they were considering cadavers to be property, their response to the trade in corpses fits neatly into that framework.

Furthermore, the speed and ubiquity with which Anglo-American law opposed the third-party commodification of human remains is telling for two major reasons. First, lawmakers and the public were clearly unwilling to acquiesce in the practical ramifications of the no-property rule's application in a secular society. Blackstone plainly stated that "stealing the corpse itself . . . is no felony,"[155] but when people actually began stealing corpses, a felony it became. Although the legal response was not to simply apply existing laws governing property to cadavers, the specialized anti-bodysnatching laws had the same real effect of outlawing the theft

---

[155]  Blackstone, *supra* note 89, at 236.

of a corpse.[156] Second, the legislative response makes clear that by the early 1800s, the legal and social tide had turned against an absolute protection of the sanctity of cadavers. Rather than a complete crackdown on the use of dead bodies, legislatures recognized the potential medical advances that could be made thanks to the study of corpses, and permitted anatomical dissection—a practice that less than fifty years before had been viewed as a punishment worse than death.[157]

Thus, by the time the anatomy laws were being passed, the no-property rule's inherent contradictions were creating serious social problems, and its critical underpinnings—a religious belief in the preservation of a corpse for the resurrection and the lack of commercial value in a body—had partially fallen away. As a result, lawmakers began to implicitly embrace the idea that a human body could be property—at least in the hands of a third party with no relation to the decedent. At the same time, courts in America and England were undertaking similar efforts to reconcile or reject the no-property rule when it conflicted with social mores.

---

[156] The reticence to apply existing laws prohibiting theft to corpses can be viewed in two ways: (1) a hangover of the no-property rule and the vestiges of religious adherence, reframed as application of the "natural law"; and/or (2) public signaling, designed to show constituents that the legislature was aware of and responding to an active problem. Given the proximity of these statutes' passage to events of community outrage, the second is, in the Court's view, the more likely explanation.

[157] *See* An Act: For the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 113 § 4 (1790).

ii.        **Post-Ecclesiastical Cadaveric Common Law**

From the early 1700s through most of the 1800s, social and legal perspectives regarding the roles of secular governments and religious institutions were undergoing immense changes. Specifically, the religious role in government was waning: in America as a foundational principle,[158] and in England through the steady reassertion of secular control.[159] "The repudiation of ecclesiastical law, coupled with the widespread departure from burial in churchyards, left an enormous gap in early American law,"[160] which threatened to leave "many flagrant civil injuries . . . without remedy."[161] Accordingly, judicial decisions dealing with subjects near the crossroads of these two regimes are frequently inconsistent and often best explained as judges' attempts to square the legal doctrines they inherited with socially acceptable outcomes.[162] These issues were further complicated because, when presented with

---

[158] *See* U.S. Const. amend. I.

[159] *See* 23 & 24 Vict. c. 32 (1860).

[160] Marsh, *supra* note 82, at 5.

[161] Jackson, *supra* note 2, at 29.

[162] *See, e.g.*, *Renihan v. Wright*, 25 N.E. 822, 823-24 (Ind. 1890) ("The decided cases bearing upon the question are somewhat confused, and are not free from conflict. This confusion and conflict arises, no doubt, in the attempt, on the part of some of the courts in this country, to follow the decisions of the courts in England, while other courts have asserted that the rule of decision in that country can have no application in the American courts. It is quite clear to us that but little light can be had upon the question now under consideration from the decisions found in the English reports, for the reason that the jurisprudence of that country is peculiarly compounded, embracing largely the ecclesiastical element not found in our jurisprudence."); *cf. Wightman v. Wightman*, 4 Johns. Ch. 343, 345-51 (N.Y. Ch. 1820) (discussing the English "Spiritual Courts[']" jurisdiction over marriage and concluding that, in cases of void marriage that were prohibited under ecclesiastical law but that did not fall within New York's civil divorce statute, they could nevertheless be reached by secular American courts as "*contra bonos mores*" or violative "of the natural law" because "there must exist such a power for this and other cases").

damages claims for harm to dead bodies, the courts were forced to square the obvious mental pain family members suffered with strict tort rules that generally did not permit recovery for emotional harm unaccompanied by actual injury to person or property, which human remains were not.[163]

In the context of the law of human remains, Professor Percival Jackson cogently describes this state of affairs:

> In examining the cases, one will find, as is so often the situation in matters involving cadavers and burial places, that the results reached through consideration of rules of other branches of the law may serve as precedents, though the bases will not; that frequently, where the courts have been strict in the application of common law rules, the result has been at variance with the requirements of existing standards and sentiments; that where the result has been in accord with the principles which in this work we lay down as the rules of the law of cadavers and burial places [as developed by 1936], the courts were compelled to some extent at least to tug at common law principles.[164]

Thus, although the case law at first appears incredibly "confused" and inconsistent, by recognizing that these courts were acting in the midst of a legal revolution in this subject area and focusing on fitting the methods to the outcomes, a more coherent

---

[163] *See* Jackson, *supra* note 2, at 135 ("No recognized form of common law action could serve the purpose [of providing a remedy for violation of rights in a body], for those actions required what a plaintiff in a cadaver case could not show—a trespass upon his person or an injury to his property."); *Fox v. City of Bellingham*, 482 P.3d 897, 900 (Wash. 2021) (en banc) (explaining limitations on recovery for emotional damages in tort actions); *Brown v. Matthews Mortuary, Inc.*, 801 P.2d 37, 40-41 (Idaho 1990) (discussing development of theories permitting recovery of emotional damages in cases involving harm to dead bodies); Stanley Ingber, *Rethinking Intangible Injuries: A Focus on Remedy*, 73 Calif. L. Rev. 772, 814 n.202 (1985) ("In essence, damages for emotional distress were parasitic to damages for physical injuries.").

[164] Jackson, *supra* note 2, at 136.

picture emerges:[165] the law recognized survivors' (and sometimes decedents') rights to control and protect dead bodies, and did so using the language of property.

Although most on point, there are very few historical criminal cases dealing with the no-property rule.[166] However, those that exist appear unanimous in rejecting the rule's application as a criminal defense. Perhaps the most analogous case to the instant motion is also one of the earliest. In the English case of *Rex v. Lynn*, the defendant was convicted "on an indictment charging him with entering a certain burying ground, and taking a coffin out of the earth, from which he took a dead body, and carried it away for the purpose of dissecting it."[167] On appeal, Lynn argued that "the offence was not cognizable in any Court of Criminal Jurisdiction: if it be any crime, it is of ecclesiastical cognizance."[168] Despite recognizing the no-property rule,[169] "[t]he Court said that common decency required that the practice should be put a stop to. That the offense was cognizable in a Criminal Court, as being highly indecent, and *contra bonos mores*; at the bare idea alone of which nature

---

[165] *See id.*

[166] American prosecutions for bodysnatching appear rare, likely because, while "[s]ome disinterment went undetected, . . . grave robbing was a practice to which individuals and authorities often intentionally turned a blind eye, particularly with regards to graveyards known as potter's fields, where bodies were buried at public expense." Rogers, *supra* note 136, at 315-16; *see State v. Doepke*, 68 Mo. 208 (1878) (larceny prosecution for stealing coffin in which defendant also took corpse and "stated that he was taking the body to be dissected," but was apparently not charged with bodysnatching).

[167] 100 Eng. Rep. 394, 394 (1788).

[168] *Id.*

[169] *Id.* at 394-95 (discussing Lord Coke's rule).

revolted."[170] Thus, faced with the reality of the *nullius in bonis* rule, the court in *Lynn* refused to apply it, instead creating an exception rooted in the natural law.

In *Commonwealth v. Cooley*, the Massachusetts Supreme Judicial Court agreed with the reasoning of *Lynn* and held that disinterring a dead body was an offense at the common law.[171] Although it held that the common law offense had been superseded by Massachusetts' first anti-bodysnatching statute, the Court had little difficulty in concluding that bodysnatching had always been illegal, even in the face of no jurisdictional precedent.[172]

And in *Meek v. State*, decided just one year before the NSPA was passed, the Indiana Supreme Court refused to reverse a conviction for blackmail on the basis of the no-property rule.[173] The defendant sent a letter to the victim-widow, Mary Ann Haltom, threatening to steal and sell her husband's corpse unless she paid him $200.[174] Meek was convicted of blackmail and on appeal argued that he could not be liable because the statute criminalized "threaten[ing] to do any injury to the person or property of any one, with intent to extort or gain from such person any chattel, money or valuable security."[175] Because "there can be no property right in a

---

[170] *Id.* at 395.

[171] 27 Mass. 37, 40 (1830) (per curiam).

[172] *Id.* (explaining that because "the dissection of human bodies was not so extensively practised in former times . . . this will account for the fact, that few, if any prosecutions at common law for this offence, have taken place in this Commonwealth.").

[173] 185 N.E. 899 (Ind. 1933).

[174] *Id.* at 900.

[175] *Id.*

dead body," he argued, "the affidavit does not allege sufficient facts to show a threatened injury to the property of Mrs. Haltom."[176] The Indiana Supreme Court rejected the argument, reasoning that "[p]roperty rights are more limited in some objects than in others, but, if there is any right of control over or interest in an inanimate material thing, it would seem to be a property right."[177] Because Mrs. Haltom had an interest in protecting her husband's body (one that I will explain *infra*), that right was sufficient to fall within the ambit of the statute.[178]

Moreover, other cases agree body selling was also an indictable offense at common law.[179] Although apparently not reported in full, in *Rex v. Gilles*, the defendant was indicted for "wilfully, unlawfully, and indecently, . . . tak[ing] and carry[ing] away with an intent to sell and dispose of . . . for gain and profit" a corpse.[180] After trying the case, the judges of the King's Bench discussed the matter and "thought it so clear that it was an indictable offence to take a person's dead body and dispose of it for gain and profit, that the learned judge [who tried the case], by their advice, forbore making a case for the opinion of all the judges."[181] And in *Thompson v. State*, the Tennessee Supreme Court affirmed a pair of convictions for

---

[176] *Id.* at 901.
[177] *Id.*
[178] *Id.*
[179] *See* Weinmann, *supra* note 76, at 21 ("[T]raffic in dead bodies has always been strictly prohibited.").
[180] Case cited in *Rex v. Duffin & Marshall*, Russ. & R. 364, 366 n.b (1818).
[181] *Id.*

the common law offense of attempting to sell a dead body.[182] Although the defendants did not argue the no-property rule, they did contend that their conduct was not a statutory offense.[183] The court rejected the argument, reasoning that "[c]ivilized countries have always recognized and protected, as sacred, the right to Christian burial, and to an undisturbed repose of the human body when buried," and citing to *Gilles* and *Lynn*.[184] On this basis, the court had no difficulty concluding that "it may be safely stated that the authorities are harmonious on the proposition that the unauthorized disposition and sale of the dead body of a human being for gain and profit is a common-law misdemeanor of high grade, and malum in se."[185]

In civil cases, despite the rejection of ecclesiastical law,[186] many American courts were understandably hesitant to jettison the *nullius in bonis* rule given its Coke and Blackstone *bona fides*. Adherence to the rule was easiest in areas where it continued to align with practical reality, and courts often went out of their way to restate the rule while cabining it to circumstances where it could be applied without difficulty. The most common of these noncontradictory areas was commerce.[187] American "courts . . . refused to treat a dead body as property in a material sense"

---

[182] 58 S.W. 213 (Tenn. 1900).
[183] *Id.* at 213-14.
[184] *Id.*
[185] *Id.* at 214; *cf. State v. Lowe*, 50 P. 912 (Kan. Ct. App. 1897).
[186] *See* Jackson, *supra* note 2, at 28-29.
[187] *Id.* at 121-22 ("The conclusion that a corpse could not be the subject of the property in the ordinary commercial sense, when the question was whether a dead body had any value as an article of traffic, led to no untoward result.").

when the issue peripherally arose in litigation.[188] For example, in *In re Wong Yung Quy*, the United States Circuit Court for the District of California held that a California law requiring payment of a $10 fee for a permit to exhume a corpse (when the applicant intended to ship it to China for permanent burial) did not violate the Constitution's prohibition on state imposition of imposts or duties on imports or exports because "the remains of deceased persons are not 'exports' within the meaning of the term as used in the constitution. The term refers only to those things which are property. There is no property in any just sense in the dead body of a human being . . . . This provision of the constitution was intended to prevent discrimination in matters of trade."[189]

Courts also held that a dead body "is not part of the assets of the estate . . .; it is not subject to replevin; it is not property in a sense that will support discovery proceedings; it may not be held as security for funeral costs; it cannot be withheld by an express company, or returned to the sender, where shipped under a contract calling for cash on delivery; it may not be the subject of a gift *causa mortis*; it is not common law larceny to steal a corpse."[190] While these rulings would appear to suggest that the no-property rule was being stringently applied in one of the most relevant senses for this case (commercial property), that reading is undercut by the

---

[188] *Id.* at 120.
[189] 2 F. 624, 631 (C.C.D. Cal. 1880); *see* U.S. Const. art. I, § 10, cl. 2.
[190] Jackson, *supra* note 2, at 120–21 (collecting cases).

observation that in all of these cases either (1) there was no evidence that the parties were treating the body as a valuable object,[191] or (2) in cases where a party *was* attempting to establish value in a corpse, the rule was being applied to *prohibit* such conduct.[192] So although the rule was being stated and sometimes applied in strict terms, courts were only doing so to maintain the state of affairs in which there was no material value in a corpse.

On the other hand, in matters "when one sought to recover for sentimental values lost through interference with one's privilege and solace of burial, our courts found in the common law rule a barrier to equitable results."[193] Such cases tended to

---

[191] *Wong Yung Quy*, 2 F. at 626-27 (no facts to show that body was being sold); *O'Donnell v. Slack*, 55 P. 906, 907 (Cal. 1899) (dispute over burial location); *Enos v. Snyder*, 63 P. 170 (Cal. 1900) (holding that body was not property subject to testamentary disposition and invalidating provision in will directing that body be given to someone other than next of kin); *Danahy v. Kellogg*, 126 N.Y.S. 444, 447-48 (N.Y. Sup. Ct. 1910) (denying request to exhume and dissect body as part of discovery in negligence action relating to decedent's death); *Driscoll v. Nichols*, 71 Mass. 488, 492 (1855) (holding that decedent could not confer a right to custody of his body in individual who was not next of kin).

[192] *Jefferson Cnty. Burial Soc'y v. Scott*, 118 So. 644, 646 (Ala. 1928) (holding that a party "could not detain the body as security for his charges."); *Am. Express Co. v. Epply*, 5 Ohio Dec. Reprint 337, 338 (Ohio Dist. Ct. Hamilton Cnty. 1876) (reasoning that there could be no lien on a corpse because "[i]t would be against public policy and grossly improper"); *Buchanan v. Buchanan*, 59 N.Y.S. 810, 811-12 (N.Y. Sup. Ct. 1899) (denying an action in replevin by wife but explaining that wife was bringing an equitable claim to move an already buried body); *cf. Keyes v. Konkel*, 78 N.W. 649, 649 (Mich. 1899) (denying motion for replevin of dead body held by undertakers as security for payment but noting that "[i]t is not contended that the defendants are entitled to maintain a lien" and implying that an action for the body's return could be maintained in equity); *Bonaparte v. Fraternal Funeral Home*, 175 S.E. 137, 139-40 (N.C. 1934) (holding widow's quasi-property right in dead body authorized damages suit against embalmer who held dead body as security for services).

[193] Jackson, *supra* note 2, at 121. As noted, at this time the common law no-property rule barred monetary relief because the emotional distress torts had not yet been developed, so emotional damages were only recoverable as part of a claim brought for damage to person or property. *See* Betsy J. Grey, *The Future of Emotional Harm*, 83 Fordham L. Rev. 2605, 2610-2615 & n.37 (2015) (describing history of emotional distress torts and noting that "[t]he American Law

43

involve two types of fact patterns: (1) a familial dispute over burial details (usually handled in courts of equity) and (2) inadvertent or intentional damage to the corpse by a non-family actor (addressed in courts of law).[194] Despite the problems created by the common law rule, however, American courts were unwilling to excise the "anachronistic property right restrictions" of the English common law in order to reach reasonable results, and instead frequently "discussed these questions on the basis of Lord Coke's dogma and sought to fashion sentimental rights by a pattern of common law property rights."[195] What resulted was a tapestry of decisions "deviat[ing] from the strict common law doctrine of no property right" to award "recoveries in proper cases" through a hodgepodge of reasoning including manipulating facts and legal causes of action, proceeding on purely equitable grounds, or recognizing a property or quasi-property right in a corpse.[196]

Several courts attempted to reimagine existing causes of action to provide a right of recovery for interference with a corpse without abandoning the no-property rule. In *Meagher v. Driscoll*, one of the earliest cases on the topic, the Massachusetts

---

Institute recognized an independent tort of intentional infliction of mental distress in the Restatement of Torts in 1948."); Ingber, *supra* note 163, at 814 n.202; William Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich. L. Rev. 874 (1939) (describing the "process of growth" toward recognition of an independent tort for invasion of the "interest in peace of mind").

[194]  Given that they rarely if ever consider the property rights of a third party, these cases are less on-point, but remain persuasive authority because the circumstances of the time did not produce directly analogous fact patterns.

[195]  Jackson, *supra* note 2, at 121.

[196]  *Id.* at 122.

Supreme Judicial Court restated the rule that "[a] dead body is not the subject of property, and after burial it becomes a part of the ground to which it has been committed, 'earth to earth, ashes to ashes, dust to dust.'"[197] But when a cemetery proprietor disinterred the remains of the plaintiff's child and moved them to a "charity lot," not knowing that the plaintiff had paid his fee for the proper burial plot,[198] the Court allowed a suit for trespass *quare clausum fregit* to proceed and, critically, permitted the plaintiff to recover damages for harm to his "feelings" based on "the circumstances which accompany and give character to the trespass."[199] The damages actually awarded and affirmed, $837.50, were far in excess of the contract value of the "property" technically at issue: $30.[200] The Court's approval of increased damages strongly suggests that it was bending the common law property limits to permit recovery for harm to the corpse.[201]

A similar strategy was employed in *Bessemer Land & Improvement Co. v. Jenkins*, in which the Alabama Supreme Court found a right of "possession in the spot of ground in which the bodies are buried" for individuals who had buried their

---

[197] 18 So. 565, 284 (1868).
[198] *Id.* at 281-83.
[199] *Id.* at 285.
[200] *Id.* at 282, 284.
[201] *See Larson*, 50 N.W. at 240 (criticizing the reasoning but not the outcome of *Meagher* and arguing that "it would be a reproach to the law if a plaintiff's right to recover for mental anguish resulting from the mutilation or other disturbance of the remains of his dead should be made to depend upon whether in committing the act the defendant also committed a technical trespass upon plaintiff's premises, while everybody's common sense would tell him that the real and substantial wrong was not the trespass on the land, but the indignity to the dead.").

family member in a public cemetery in which they had no title or fee.[202] This novel right was carefully circumscribed to "entitle [the next of kin] to action against the owners of the fee or strangers who, without his consent, negligently or wantonly disturb [the grave]."[203]

Some courts sidestepped the question (often after stating the formal no-property rule) by acknowledging the need for some judicial protection of survivors' interests (which had previously been handled by ecclesiastical courts) and creating totality-of-the-circumstances analyses for use in deciding such questions in courts of equity. Confronted with a burial dispute between the decedent's wife, with whom he had not lived for several years, and his apparent paramour, who the decedent requested be placed in charge of his burial, the Supreme Court of California acknowledged that, although there was little precedent, "as some one must, of necessity, bury the dead, and must have the temporary possession of the dead body for that purpose, in the few cases where there has been any question on the subject equity has been invoked, and courts of equity have assumed jurisdiction and have given the necessary remedies."[204] Those cases most frequently resulted in "the right of burial of a deceased wife or husband belong[ing] to the surviving spouse, and in

---

[202] 18 So. 565, 568 (Ala. 1895).

[203] *Id.*; *see* Harry R. Bigelow, Jr., Note, *Damages: Pleading: Property: Who may recover for wrongful disturbance of a dead body*, 19 Cornell L.Q. 108, 108 (1933) (collecting authority applying trespass *quare clausum fregit* theory and criticizing it as "nothing more than a fictional 'hook' on which to hang liability").

[204] *Enos*, 63 P. at 171.

other cases to the next of kin," so the court applied that outcome and held for the estranged wife.[205]

In *Fox v. Gordon*, a case from the Philadelphia County Court of Common Pleas, Judge Thayer considered a widower's suit to exhume the bodies of his late wife and daughter from his wife's family plot for reinterment elsewhere after a falling out with his parents-in-law.[206] Judge Thayer began his reasoning by explaining that "[q]uestions which relate to the custody and disposal of the remains of the dead do not depend upon the principles which regulate the possession and ownership of property."[207] The rules governing such issues were instead derived from "rights and duties recognized by the laws and usages of society, as growing out of the natural relations of human beings to each other and the divine and human laws which bind society together."[208] Applying these "rights and duties" required a careful balancing of:

> considerations arising partly out of the domestic relations, the duties and obligations which spring from family relationship and the ties of blood; partly out of the sentiment so universal among all civilized nations, ancient and modern, that the dead should repose in some spot where they will be secure from profanation; partly out of what is demanded by society for the preservation of the public health, morality and decency, and partly often out of what is required by a proper respect for and observance of the wishes of the departed themselves.[209]

---

[205] *Id.* at 171-72 (also reasoning that statutory provisions supported the outcome).
[206] 16 Phila. Rep. 185, 190 (Pa. Ct. C.P. Phila. Cnty. 1883).
[207] *Id.* at 185-86.
[208] *Id.* at 186.
[209] *Id.*

So although Judge Thayer cited the no-property rule, he did so in order to apply a totality-of-the-circumstances test, and denied the husband's suit based on his prior consent to the burial location and the lapse of three years since the burials.[210]

By far the most common approach appears to have been to take the no-property rule semi-head on, declaring that there is at least a "quasi-property" right in dead bodies, subject to equitable considerations factoring in the wishes of other interested parties and practical requirements to maintain public health. This was essentially the conclusion of Samuel Ruggles in his report on the widening of Beekman Street, in which he concluded "2. That the right to bury a corpse and to preserve its remains, is a legal right, which the courts of law will recognize and protect [and] 3. That such right, in the absence of any testamentary disposition, belongs exclusively to the next of kin."[211]

In the widely cited case of *Pierce v. Proprietors of Swan Point Cemetery*, the Rhode Island Supreme Court began by acknowledging "[t]hat there is no right or property in a dead body, using the word in its ordinary sense, may well be

---

[210] *Id.* at 189-90 ("We do not think that a court of equity ought to stretch out its arm to aid him in such an effort. Little Marie Fox sleeps in the spot selected by her mother and agreed to by the complainant. The mother reposes by her side also by his consent, and in the spot which of all others she would have preferred. Ought he to be allowed to exhume these bodies and to carry them away to another place because of his alienation from his wife's family? He certainly has no property in them which would justify such a proceeding, and what good purpose is to be subserved by it?").

[211] Ruggles, *supra* note 2, at 58.

admitted."[212] But the court recognized that "the burial of the dead is a subject which interests the feelings of mankind to a much greater degree than many matters of actual property."[213] Because of that interest, "some one" must have "a duty, and we may also say a right, to protect from violation; and a duty on the part of others to abstain from violation."[214] Considering the duties and rights that attach to it, a dead body "may therefore be considered a sort of quasi property, and it would be discreditable to any system of law not to provide a remedy in such a case."[215] Yet as "quasi property," "the person having charge of [the body] cannot be considered as the owner of it in any sense whatever; he holds it only as a sacred trust for the benefit of all who may from family or friendship have an interest in it, and we think that a court of equity may well regulate it as such, and change the custody if improperly managed."[216]

---

[212] 10 R.I. 227, 237 (1872). Maclean cites *Pierce* for its general acknowledgement of the no-property rule, but ignores the analysis the follows that statement in which the court found a "quasi-property" right. Maclean's only other case from this era, *Wynkoop v. Wynkoop*, 42 Pa. 293 (1861), does not actually support her proposition. The statement Maclean cites is attorney argument, *see id.* at 298 ("E.P. Dewees and F.W. Hughes, for appellants."), and the Pennsylvania Supreme Court's opinion did not address the property question at all, *see id.* at 300-03.

[213] 10 R.I. at 237-38.

[214] *Id.* at 238.

[215] *Id.*

[216] *Id.* at 243; *accord Page v. Symonds*, 63 N.H. 17, 19-20 (1883) ("While [a dead body] is not property in the ordinary sense of the term, it is regarded as property so far as to entitle the relatives to legal protection from unnecessary disturbance and wanton violation or invasion of its place of burial. The plaintiff, notwithstanding he is neither the owner of the soil of the cemetery nor of the remains of his deceased relatives interred there, may nevertheless be authorized to invoke protection against unnecessary desecration of their place of burial."); *Hackett v. Hackett*, 26 A. 42, 43 (R.I. 1893); *Painter v. U.S. Fid. & Guar. Co.*, 91 A. 158, 160 (Md. 1914).

Similarly, in *Foley v. Phelps*, the New York Appellate Division favorably cited *Pierce* and explained that, although "[b]y the common law and *stricti juris* the proposition as to [no] property may be maintainable," "courts of equity have frequently interfered to protect the remains of the dead; and courts of law have also afforded remedies through formal legal actions wherever any element of trespass to property, real or personal, was associated with the molestation of the remains of the dead."[217] Thus, "[i]n more recent times the obdurate common-law rule has been very much relaxed, and changed conditions of society, and the necessity for enforcing that protection which is due to the dead, have induced courts to re-examine the grounds upon which the common law rule reposed, and have led to modifications of its stringency."[218] In *Foley*, the court approved an action to recover damages for wrongful dissection, basing it in a "right to the possession of the body for the purpose of burying it."[219]

In *Louisville & N.R. Co. v. Wilson*, the Supreme Court of Georgia agreed that there must be some kind of property right in a body, and denied a no-property

---

[217] 1 A.D. 551, 554-55 (N.Y. App. Div. 1896).

[218] *Id.* at 555.

[219] *Id.*; *accord O'Donnell*, 55 P. at 907 (approvingly citing *Pierce* and reasoning that "the next of kin, while not, in the full proprietary sense, 'owning' the body of the deceased, have property rights in the body which will be protected, and for a violation of which they are entitled to indemnification. Thus, if the right is interfered with, damages will be awarded."); *Floyd v. Atl. Coast Line Ry. Co.*, 83 S.E. 12, 12-13 (N.C. 1914) (citing *Pierce*, 10 R.I. 227, *Larson*, 50 N.W. 238, and *Foley*, 1 A.D. 551); *England v. Central Pocahontas Coal Co.*, 104 S.E. 46, 47 (W. Va. 1920) ("The right however to bury a corpse and to preserve the remains is a legal right which the courts of this country recognize and protect; and this right is regarded as a quasi right of property."); *see also* cases cited at Jackson, *supra* note 2, 124 n.57.

defense when it would have permitted the defendant to benefit from treating a body like property without incurring the attendant risks.[220] The plaintiff had contracted with the defendant railroad to transport her husband's body from Atlanta to Warrenton for burial.[221] The railroad transferred the body between trains partway, but while it was awaiting transfer the coffin was left in the rain for several hours, causing "the body . . ., the shroud, and coffin [to be] 'soaked and otherwise mutilated.'"[222] After reviewing the now-familiar cases, the court accepted that "there is a property right, or a quasi property right, in a dead body, subject, of course, to the necessity for proper disposition, and not to allow it to become a nuisance or injurious to the public welfare."[223] Based on that right, the court held that a cause of action for damage to the corpse was viable, and rejected the possibility that the no-property rule could be raised as a defense, reasoning that "[i]t certainly cannot be said by the defendant company that a corpse is sufficiently property for a railroad company to receive and accept pay for its transportation, but is not sufficiently property to authorize a recovery for a breach of duty arising therefrom, or to prevent any duty from arising under such circumstances."[224]

---

[220] 51 S.E. 24 (Ga. 1905).

[221] *Id.* at 24-25, 28.

[222] *Id.* at 24-25.

[223] *Id.* at 27.

[224] *Id.* at 28; *see Wall v. St. Louis & S.F.R. Co.*, 168 S.W. 257, 258-59 (Mo. Ct. App. 1914) (applying quasi-property rule to sustain next of kin's action to recover for an "injury done or indignity committed upon the body of his deceased.").

The development and state of the American rule is most clearly explicated in two decisions: by the Minnesota Supreme Court in *Larson v. Chase*, and by the Supreme Court of this Commonwealth in *Pettigrew v. Pettigrew.* In *Larson*, the court explained that "[i]nclined to follow the precedents of the English common law, [colonial and early American] courts were at first slow to realize the changed condition of things, and the consequent necessity that they should take cognizance of these matters and administer remedies as in other analogous cases."[225] Through a "process of gradual development, . . . all courts now concur in holding that the right to the possession of a dead body for the purposes of decent burial belongs to those most intimately and closely connected with the deceased by domestic ties."[226] So:

> while it may be true still that a dead body is not property in the common commercial sense of that term, yet in this country it is, so far as we know, universally held that those who are entitled to the possession and custody of it for purposes of decent burial have certain legal rights to and in it which the law recognizes and will protect. *Indeed, the mere fact that a person has exclusive rights over a body for the purposes of burial leads necessarily to the conclusion that it is his property in the broadest and most general sense of that term,* viz*., something over which the law accords him exclusive control.* But this whole subject is only obscured and confused by discussing the question whether a corpse is property in the ordinary commercial sense, or whether it has any value as an article of traffic. The important fact is that the custodian of it has a legal right to its possession for the purposes of preservation and burial, and that any interference with that right by mutilating or otherwise disturbing the body is an actionable wrong.[227]

---

[225] *Larson*, 50 N.W. at 238.
[226] *Id.* at 238-39.
[227] *Id.* at 239 (emphasis added).

In *Pettigrew*, the Pennsylvania Supreme Court similarly concluded that allegiance to the English common law had created unnecessary confusion and problems in the American jurisprudence:

> It is commonly said, being repeated from the early cases in England, where the whole matter of burials was under the jurisdiction of the ecclesiastical courts, that there can be no property in a corpse. But, inasmuch as there is a legally recognized right of custody, control, and disposition, the essential attribute of ownership, *I apprehend that it would be more accurate to say that the law recognizes property in a corpse, but property subject to a trust, and limited in its rights to such exercise as shall be in conformity with the duty out of which the rights arise*. Whether, however, the rights be called 'property' or not is manifestly a question of words, rather than of substance.[228]

In these cases, the courts recognized that jurisdictions using the American approach were essentially finding property rights in cadavers, even if they were not willing to expressly say so, and that the distinction between the totality approach to devising appropriate remedies, a "quasi-property" rule, or a rule of property subject to strict limitations was really one without a difference.

At least one court appears to have been willing to take the leap and hold that bodies can be property outright. In *Bogert v. City of Indianapolis*, the Supreme Court of Indiana explained in dicta that "we lay down the proposition, that the bodies of the dead belong to the surviving relations, in the order of inheritance, as property, and that they have the right to dispose of them as such, within restrictions analogous

---

[228] *Pettigrew*, 56 A. at 879 (emphasis added); *see Johnson's Estate*, 7 N.Y.S.2d at 86-87 (describing *Pettigrew* as "correctly stat[ing] the actual drift of American decisions").

to those by which the disposition of other property may be regulated."[229] Thirty years later, the court restated *Bogert* as a holding, reaffirming in slightly watered down terms "that the bodies of the dead belong to the surviving relatives in the order of inheritance as other property, and that they have the right to the custody and burial of the same. Our conclusion is that the custody of a corpse, and the right of burial, does not belong to the executor or administrator, but to the next of kin; and that the courts of this state possess the power to protect such next of kin in the exercise of such right."[230]

These cases, though widely divergent in their approach to finding legal rights in dead bodies, concur in the result: next of kin have rights of "custody, control, and disposition of a *res* that itself is not material property."[231] From these outcomes, Jackson concluded that "the English property right rule . . . has been substantially rejected in this country."[232] More specifically, "[i]n this country, we have rejected the English rule when its effect would have been to deny the claims of reason and of human rights and thereby permit violation of sound morals and human emotions.

---

[229] 13 Ind. 134, 138 (1859).

[230] *Renihan*, 25 N.E. at 825.

[231] Jackson, *supra* note 2, at 124-25; *see Whaley v. Cnty. of Tuscola*, 58 F.3d 1111, 1114-16 (6th Cir. 1995) (finding a constitutional due process property right in a dead body because state law established rights common to the "bundle of rights" of property, including "the right to control the disposal of the body," "to possess the body for burial," and "a claim . . . against those who disturb a buried dead body" (citing *Brotherton*, 923 F.2d 477)).

[232] Jackson, *supra* note 2, at 51-52; *Spiegel v. Evergreen Cemetery Co.*, 186 A. 585, 586 (N.J. 1936) ("[I]t is now the prevailing rule, in England as well as in this country, that the right to bury the dead and preserve the remains is a quasi right in property, the infringement of which may be redressed by an action in damages. The dead body is no longer *res nullius*.").

With the same motive, we have refused to permit the pendulum to swing too far the other way."[233] In sum, American courts actively deviated from the no-property rule when it generated bad outcomes, but adhered to it when it comported with social mores. Through decades of experimentation, the American rule took on the language of property. And most of the rights the American courts recognized were tailored to meet the practical realities of handling a corpse.[234]

<h3>iii.       Application</h3>

In this section the Court explored in detail the social and legal changes in the realm of cadavers that led up to the passage of the NSPA in 1934. Now, however, it is time to take a step back. All of what I have reviewed, "grammar and dictionary definitions—along with statutory structure and history" has been in service of an effort to "seek the law's ordinary meaning."[235] So although I have been deep in the weeds of the technical question of whether human remains can legally be considered "property," I must now consider—against this backdrop—what the actual statutory terms, "goods, wares, and merchandise," would have "conveyed to reasonable people at the time they were written."[236] Several considerations from the historical record illustrate an embrace of property rights in a corpse and a rejection of the no-

---

[233] Jackson, *supra* note 2, at 52.
[234] *See supra* at 21-22.
[235] *Niz-Chaves v. Garland*, 593 U.S. 155, 168-69 (2021).
[236] Scalia & Garner, *supra* note 31, at 16.

property rule's core assumptions, which together convince the Court that the ordinary meaning of the phrase in 1934 would have included body parts.

First, the common law no-property rule had been substantially rejected in America over the preceding half century. As the New Jersey Supreme Court stated just two years after the passage of the NSPA, "[t]he dead body is no longer *res nullius*."[237] Although the courts were hesitant to extend the full panoply of property rights to dead bodies, they readily found sufficient sticks in the bundle to grant next of kin the right to protect their legitimate interests, to impose duties on others to respect those rights, and to punish those who transgressed. Secular law's use of property concepts to protect these individual rights demonstrates a partial rejection of the idea that the corpse was a sacred object, reserved to the purview of religion. And to the extent the rule continued to be employed in America, it was used *to prohibit* ownership of a dead body for commercial purposes—not to insulate those who had already commodified a body from repercussions.[238]

Second, as far the Court is aware, the pre-1934 historical record does not contain a single criminal case in which the no-property rule was successfully invoked to avoid prosecution. The argument was asserted at least three times, and in every case the court rejected it. In *Rex v. Lynn*, the court simply declared that taking

---

[237] *Spiegel*, 186 A. at 586.
[238] *But see Keyes*, 78 N.W. at 649 (denying action in replevin brought against undertakers holding a cadaver as security for payment of their fee).

a body was an offense under the common law.[239] In *Cooley*, the Massachusetts Supreme Judicial Court cited *Lynn* to reject the same argument.[240] And in *Meek*, the Indiana Supreme Court specifically extended the next of kin's quasi-property rights to the criminal law, holding that a widow's "right of control over or interest in [the corpse]" was sufficient to render the corpse property for the purposes of imposing criminal sanctions on third parties.[241] Indeed, other cases support the proposition that it is "the universal rule of law in civilized countries that it is an indictable offense to disinter and remove dead bodies wantonly or for the sake of gain."[242] Furthermore, history shows that, faced with the prospect that the no-property rule might unwittingly sanction a black-market in cadavers, legislatures quickly moved to close the loophole and made the conduct at issue a statutory crime. So applying the rule to protect an individual from prosecution for dealing in dead bodies would actually be the deviation from the historical norm. One could even argue that there was a common law criminal exception to the no-property rule, one that Congress knowingly adopted along with the rest of the body of common law.[243]

---

[239]  100 Eng. Rep. at 395.

[240]  27 Mass. at 40.

[241]  185 N.E. at 901.

[242]  *Gray v. State*, 114 S.W. 635, 641 (Tex. Crim. App. 1908); *Thompson*, 58 S.W. at 213-14 (affirming conviction for non-statutory common law offense of attempting to sell a corpse); *see* Jackson, *supra* note 2, at 175 nn.354-55 (collecting state statutes criminalizing unauthorized exhumation).

[243]  Jackson, *supra* note 2, at 43 ("Aside from statute, there can be no doubt that . . . body stealing after burial was a common law offense." (citing *Lynn*, 100 Eng. Rep. 394)); *see Morissette*, 342 U.S. at 240.

Third, regarding bodies as saleable property was far from inconceivable as a practical matter in 1934. Bodysnatching had been big business a century earlier, and the practice generated significant public attention and remained a matter of historical interest such that a reasonable person would have been well aware of it. For example, in one of his most famous works, *A Tale of Two Cities*, Charles Dickens used the exact language of the statute—"goods"—to describe bodysnatchers' treatment of "people's bodies."[244] Thus, it was a matter of common knowledge that cadavers could have serious value.

Considering this historical backdrop, a reasonable person in 1934 viewing the text of the statute and conduct at issue in this case—actually buying, selling, and possessing stolen human remains—would have understood section 2314 to apply based on the quasi-property rights of next of kin and the transgressive conduct of the defendant. And any other reading would produce a ridiculous result.[245] Katrina Maclean is alleged to have treated human remains as property. She purchased them from others, held them in her own possession, listed them for sale through her

---

[244] Charles Dickens, *A Tale of Two Cities* 166 (Vintage Books 2012) (1859) (In a conversation between Jerry Cruncher—a "Resurrection-Man"—and his son, Young Jerry, Mr. Cruncher explains that a Resurrection-Man's "goods" "is a branch of Scientific goods." Young Jerry inquires "Persons' bodies, ain't it, father?" to which Mr. Cruncher confirms: "I believe it is something of that sort.").

[245] *See United States v. Lucidonio*, 137 F.4th 177, 182 (3d Cir. 2025) ("We are also mindful that 'there is no canon against using common sense in construing laws as saying what they obviously mean.'" (quoting *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 63 (2004))); *cf. Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018) (quoting *In re Kaiser Aluminum Corp*, 456 F.3d 328, 338 (3d Cir. 2006))).

business, and sold and shipped them to buyers. To apply the no-property rule to dismiss an indictment for engaging in such conduct with *stolen* body parts would create an untenable legal paradox: a person may snatch away human remains without authorization from any person with a legal interest in them, treat them as property, spirit them across state lines, and freely engage in nationwide business with them without facing any federal repercussions, all because—notwithstanding the defendant's own actions—human remains are technically not property.[246] In the face of a common law tradition so staunchly aligned to protect cadavers from disturbance, this outcome would be as absurd as can be imagined. Instead, the historical record compels the conclusion that one who violates the no-property rule thereby forfeits any protection it offers.[247]

Additionally, under Third Circuit law on the statutory adoption of common law concepts, it is arguable that Congress did not adopt the no-property rule at all when it passed section 2314. "If Congress uses a term in a criminal statute that has no widely accepted common law meaning at the time of enactment, the term should be given the meaning consistent with the purpose of the enactment and its legislative

---

[246] *Cf. McElroy v. United States*, 455 U.S. 642, 655 (1982) (rejecting interpretation of section 2314 under which a defendant "easily could evade the reach of federal law, yet operate in the channels of interstate commerce").

[247] *Louisville & N.R. Co.*, 51 S.E. at 28 ("It certainly cannot be said that a corpse is sufficiently property . . . to receive and accept pay for it[] . . ., but is not sufficiently property to authorize a recovery for a breach of duty arising therefrom, or to prevent any duty from arising under such circumstances.").

history."[248] Furthermore, "the courts should not infer congressional adoption of a common law definition plagued by 'hair-splitting distinctions.'"[249] If one rejects the Court's conclusion that the common law property treatment of dead bodies had by 1934 reached a relatively settled state in favor of at least limited property rights in relevant cases, it must be accepted that the law was in a state of "confusion" that was trending toward the recognition of limited property rights.[250]

In *United States v. Everett*, the Third Circuit refused to interpret the term "attempt" in 21 U.S.C. § 846 to include an impossibility defense, as it had at common law.[251] It took that path because, by the time of the statute's passage in 1970, the doctrine of impossibility "had become 'a source of utter frustration,' plunging the state courts into a 'morass of confusion,'" "result[ing] in 'considerable conflict of authority' among common law courts."[252] In the face of that confusion, the Third Circuit looked to Congress's intent and determined that, because Congress had expressed an interest in maximal coverage of the federal drug laws, it "clearly

---

[248] *United States v. Everett*, 700 F.2d 900, 904 (3d Cir. 1983) (citing *Turley*, 352 U.S. at 411-13); *see Gundy*, 588 U.S. at 141 ("[B]eyond context and structure, the Court often looks to 'history and purpose' to divine the meaning of language." (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)); *cf. United States v. Stevens*, 70 F.4th 653, 657 (3d Cir. 2023) ("[T]he Court only looks to legislative history, if at all, 'when interpreting ambiguous statutory language.'" (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) (emphasis omitted)).

[249] *Everett*, 700 F.2d at 904 (quoting *United States v. Bailey*, 444 U.S. 349, 406-07 (1980)).

[250] *Id.*; *Renihan*, 25 N.E. at 823-24 ("The decided cases bearing upon the question are somewhat confused, and are not free from conflict."); *Larson*, 50 N.W. at 239.

[251] 700 F.2d at 904.

[252] *Id.* at 905 (quoting *United States v. Thomas*, 13 U.S.C.M.A. 278, 286-87 (1962)).

intended that the doctrine of impossibility, whose viability at common law was questionable at best, should not hamper federal efforts to enforce the drug laws."[253]

Here, faced with confusion in the common law, the Court considers Congress's intent in passing the NSPA "to federalize certain crimes in order to aid the states."[254] With the advent of the automobile, local prosecutions of theft and its related offenses had become a challenge because of the ease with which criminals could move stolen goods across state lines.[255] To combat this problem, Congress passed the National Stolen Motor Vehicle Act in 1919,[256] and later used it as the model for the NSPA.[257] Thus, that act was passed "to 'com[e] to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent.'"[258]

Congress's "broad purpose" strongly suggests that cadavers should be included in the definition of "goods, wares, and merchandise."[259] As noted, the states

---

[253] *Id.* at 906-07.

[254] *Smith*, 686 F.2d at 245; *Dowling*, 473 U.S. at 207 ("Congress responded in the National Stolen Property Act to 'the need for federal action' in an area that normally would have been left to state law." (quoting *Turley*, 352 U.S. at 417)).

[255] *Smith*, 686 F.2d at 244 (quoting *Turley*, 352 U.S. at 413-14).

[256] *See* 18 U.S.C. § 2312.

[257] *Smith*, 686 F.2d at 245.

[258] *Moskal v. United States*, 498 U.S. 103, 110 (1990) (quoting *United States v. Sheridan*, 329 U.S. 379, 384 (1946)); *Dowling*, 473 U.S. at 220 ("Congress acted . . . to assist the States' efforts to foil the 'roving criminal,' whose movement across state lines stymied local law enforcement officials.").

[259] *McElroy*, 455 U.S. at 655.

had all passed laws prohibiting the wrongful taking of dead bodies to combat the business of bodysnatching. The then-new threat of interstate transportation of a purloined corpse was just a real as for any other tangible object. There is no basis for concluding that Congress intended to "hobbl[e] federal prosecutors" in their efforts to "aid" states' enforcement of traditionally local laws that had gained an interstate flavor when those laws happened to involve dead bodies.[260]

In sum, by 1934, the common law of property, the historical record, congressional intent, and simple logic all point in one, inexorable direction: "goods, wares, and merchandise" can and does include human remains when a criminal defendant is alleged to have stolen, bought, and sold those remains. The common law no-property rule, designed to protect corpses from desecration, provides no shelter to those whose actions flout the very principle for which it stands.

### c.    *Nullius in Bonis* Today: Transplants and the Decline of Quasi-Property

Having determined the ordinary public meaning of section 2314 at the time of enactment, a court's statutory interpretation analysis would normally be complete. However, although the issue is not briefed by either party, their arguments suggest that they view modern applications of the no-property rule as relevant to the statutory interpretation question at hand.[261] That approach presents two questions: (1) does

---

[260] *Id.* at 654-55.
[261] *See* Doc. 112 at 7-8 (primarily citing authority from the last 30 years); Doc. 117 at 9-14 (citing authority from the last 30 years).

section 2314 incorporate a "dynamic" understanding of the term property, such that courts should update their interpretation of the statute to comport with the legal landscape at the time of the events at issue, and (2) if so, what was the state of the no-property rule when Katrina Maclean was allegedly trading in human remains in 2020-21.

"According to the 'reference' canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises."[262] On this understanding, Congress's use of a broad common law concept in a statute "adopt[s] the term . . . along with its dynamic potential. It invokes the common law itself, and not merely the static content that the common law had assigned to the term [at the time of the statute's enactment]."[263] With regard to section 2314, it is reasonable to conclude that "[t]he term ['goods, wares, and merchandise,'] in the statute, like the term at common law, refers not to a particular list [of items], but to a particular economic consequence, which may be . . . quite different . . . in varying times and circumstances."[264] Such a reading would seem logically necessary given the continuous human drive for innovation and invention: there will always be new goods for sale, many of which may have been unimaginable

---

[262] *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209 (2019) (Roberts, C.J.) (citing 2 J. Sutherland, *Statutory Construction* §§ 5207-08 (3d ed. 1943) and *Snell v. Chicago*, 24 N.E. 532, 537 (Ill. 1890)).

[263] *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 732 (1988) (Scalia, J.); *see Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 275 (1995).

[264] *Bus. Elecs. Corp.* 485 U.S. at 731; *West v. Gibson*, 527 U.S. 212, 218 (1999).

to previous generations. Ultimately, the Court assumes without deciding that "goods, wares, and merchandise" in section 2314 should be interpreted dynamically because, after a review of the post-1934 history of the law of human remains, the outcome would be the same either way. The Court turns to that history next.

Courts' various workarounds to the common law no-property rule created a more-or-less functional legal framework for managing cadavers for approximately twenty years.[265] But two changes fractured the newly settled ground on which the courts' next-of-kin-focused approaches had come to rest. First, the acknowledgment and widespread adoption of tort actions for emotional distress obviated the need to find a property right in a corpse to support damages suits for interference therewith. And, second, the first successful kidney transplant in the United States in 1954 fundamentally changed the no-property rule's core tenet that there is no value in a dead body.[266] These developments resulted in contradictory lines of theory regarding property in a dead body: the quasi-property approach to next of kin's right to recover for damage to a corpse was largely rejected, while courts encountering cadavers in commerce gradually began to acknowledge the practical reality that a body can be treated as property.

---

[265] *See generally* Percival Jackson, *The Law of Cadavers and of Burial and Burial Places* 123-83 (2d ed. 1950) (substantially similar to prior edition).

[266] *Newman v. Sathyavaglswaran*, 287 F.3d 786, 794 (9th Cir. 2002); *see* Scott, *supra* note 3, at 14-17 (describing the increased value of and demand for human remains).

### i.      Rejection of Quasi-Property

As noted, by the mid-1930s, most American courts agreed that next of kin could bring a suit to recover for interference with a dead body based on their quasi-property right in the cadaver.[267] The property-based theory of recovery was developed in order to "circumvent" "traditional tort doctrine" which generally "did not permit suit for emotional damages in tort actions," or required proof of a physical injury to person or property before emotional damages were available.[268] By the late 1940s and early 1950s, however, American courts had largely adopted a tort cause of action to recover directly for emotional distress.[269] Finding the new emotional distress tort more applicable to the harms at issue,[270] from approximately the early 1970s until today, courts considering actions to recover for interference with a corpse have begun to abandon the old quasi-property rule in favor of an emotional distress approach.[271]

---

[267] *Brown*, 801 P.2d at 40-41 (citing Prosser & Keeton, *Law of Torts* § 12 (5th ed. 1984)).

[268] *Fox*, 482 P.3d at 900; *see Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877, 880 (Colo. 1994) (en banc) ("If the plaintiff could show that his property right had been harmed, he would avoid the burden of proving that his emotional distress was accompanied by physical injury." (citing *Strachan v. John F. Kennedy Mem'l Hosp.*, 538 A.2d 346 (N.J. 1988)); *cf. Meagher*, 99 Mass. at 284 (permitting extensive recovery for emotional damages in basic trespassory suit).

[269] *Carney v. Knollwood Cemetery Ass'n*, 514 N.E.2d 430, 432 (Ohio Ct. App. 1986).

[270] *Cf. Larson*, 50 N.W. at 240 ("[I]t would be a reproach to the law if a plaintiff's right to recover for mental anguish resulting from the mutilation or other disturbance of the remains of his dead should be made to depend upon whether in committing the act the defendant also committed a technical trespass upon plaintiff's premises, while everybody's common sense would tell him that the real and substantial wrong was not the trespass on the land, but the indignity to the dead.").

[271] Incidentally, the development of the quasi-property rule in the context of burial rights and disputes was essentially frozen by the near-ubiquitous enactment of statutes codifying "a personal obligation or right with respect to the disposition of human remains." Marsh, *supra*

Commentators appear to have been some of the first movers toward forsaking the quasi-property approach. By the early 1970s, Dean William Prosser acknowledged that "[i]n most of the[] cases" "allow[ing] recovery for mental distress at the intentional mutilation or disinterment of a dead body," "the courts have talked of a property right in the dead body . . . which serves as a foundation for the action for mental disturbance," but criticized the property approach as "unsatisfactory" because the body "cannot be sold or conveyed unless it should happen to be willed to a hospital, can be used only for the one purpose of burial, and not only has no pecuniary value but is a source of liability for funeral expenses."[272] Similarly, in 1979 in the Restatement (Second) of Torts, the authors described as a unique tort the concept that "[o]ne who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body."[273] But the section's comment advises that:

> The technical basis of the cause of action is the interference with the exclusive right of control of the body, which frequently has been called by the courts a "property" or a "quasi-property" right. This does not, however, fit very well into the category of property, since the body ordinarily cannot be sold or transferred, has no utility and can be used only for the one purpose of interment or cremation. In practice the

---

note 82, at 46 (noting "the uncertainty contained in the common law doctrine" and the fact that "[f]orty-six states and the District of Columbia have statutes" on the issue).

[272] William L. Prosser & John W. Wade, *Cases & Material on Torts* 73 (5th ed. 1971).

[273] Restatement (Second) of Torts § 868 (Am. L. Inst. 1979).

> technical right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress.[274]

Courts began to follow this new line of reasoning relatively quickly. In *Johnson v. Woman's Hospital*, the Tennessee Court of Appeals affirmed a cause of action for "outrageous conduct" and emotional damages in breach of contract for the improper disposal of a stillborn baby.[275] The court explained "Tennessee has long permitted the recovery of substantial damages for mental suffering alone in the breach of a contract to bury or embalm a body," and held that such emotional damages are available in contract or tort claims regarding corpses without any need to resort to "such legal fictions as the trespass of the property rights of the next of kin in the body of the deceased."[276] Similarly, in a tort action for wrongful performance of an autopsy, the Supreme Court of Wisconsin affirmed that next of kin can bring a tort action for "mutilating or disturbing of the corpse" that is rooted "not in a property right in a dead body but in the personal right of the family of the deceased to bury the body."[277] The court rejected a property approach because "[t]he law is not primarily concerned with the extent of physical injury to the bodily remains but with whether there were any improper actions and whether such

---

[274] *Id.* § 868 cmt. a; *see* Am. Jur. (Second), Dead Bodies §§ 4, 6.

[275] 527 S.W.2d 133 (Tenn. Ct. App. 1975).

[276] *Id.* at 141; *see Golston v. Lincoln Cemetery, Inc.*, 573 S.W.2d 700, 704-05 (Mo. Ct. App. 1978) (noting the historical requirement of a physical injury to recover emotional damages, but holding that proof of physical injury was not necessary in case involving disposal of body).

[277] *Scarpaci v. Milwaukee Cnty.*, 292 N.W.2d 816, 820 (Wis. 1980).

actions caused emotional or physical suffering to the living kin. The tort rarely involves pecuniary injury; the generally recognized basis of damages is mental suffering."[278]

Much of the litigation around the continued application of the quasi-property rule centers on standing. Because the quasi-property theory was developed in two parallel lines of case law—the duty to bury and the right to recover for harm—some courts had limited damages suits to a single next of kin who bore the duty of disposal.[279] Courts tended to reject this quasi-property limitation on recovery, reasoning that an emotional distress theory would be more appropriate and permit more reasonable recovery. For example, in *Carney v. Knollwood Cemetery Association*, the Ohio Court of Appeals rejected the quasi-property approach as

---

[278] *Id.* at 820-21; *see Papieves v. Lawrence*, 263 A.2d 118, 120-21 (Pa. 1970) ("While the decisions in other jurisdictions have frequently spoken of the next of kin's property or quasi-property rights in the body of the decedent, the underlying, and we believe real, issue is the right of a decedent's nearest relatives to protection against intentional, outrageous or wanton conduct which is peculiarly calculated to cause them serious mental or emotional distress."); *Walser v. Resthaven Mem'l Gardens, Inc.*, 633 A.2d 466, 472-73 (Md. Ct. Spec. App. 1993) ("If we accept that there is a right not to have the bodies of deceased next-of-kin disturbed and a concomitant duty to respect that right, and we further recognize that a breach of that duty can cause significant emotional distress and possibly physical injury as well, the existing causes of action for negligence and intentional infliction of emotional distress suffice."); *Boorman v. Nevada Mem'l Cremation Soc'y*, 236 P.3d 4, 7-8 (Nev. 2010) (rooting recovery for negligent handling of remains in emotional distress tort); *cf. Meyer v. Nottger*, 241 N.W.2d 911, 917-18 (Iowa 1976) (approving emotional distress action without discussing property rule); *Payne v. Ala. Cemetery Ass'n*, 413 So.2d 1067, 1071-73 (Ala. 1982) (finding non-trespass tort cause of action and avoiding property question in standing analysis); *Brown*, 801 P.2d at 43-44 (functionally adopting negligent infliction of emotional distress tort but limiting recovery to first next-of-kin); *Guth v. Freeland*, 28 P.3d 982 (Haw. 2001).

[279] *See Brown*, 801 P.2d at 44 (holding that "the only person entitled to the exception [for emotional damages without physical injury] is the person entitled to the proper disposition of the body").

"long . . . discredited" and described "[a] trend away from the quasi-property fiction . . . in the case law."[280] Based on this trend, the court "reject[ed] the theory that a surviving custodian has quasi-property rights in the body of the deceased, and acknowledge[d] the cause of action for mishandling of a dead body as a sub-species of the tort of infliction of serious emotional distress" in order to expand standing to sue to immediate family members of the decedent.[281] Similarly, the Supreme Court of Montana in *Contreraz v. Michelotti-Sawyers* "reject[ed] the quasi-property approach and general rule that standing is limited to the person who had the legal right to the disposition of the body," opting instead to classify the tort as a strain of negligent infliction of emotional distress.[282]

A final line of these cases revisiting the quasi-property approach rejects the viability of conversion claims in favor of the emotional distress torts. In *Culpepper v. Pearl Street Building, Inc.*, the en banc Supreme Court of Colorado held that a

---

[280] 514 N.E.2d at 434-35.

[281] *Id.* at 435-36.

[282] 896 P.2d 1118, 1120-22 (Mont. 1995); *see Christensen v. Superior Court*, 820 P.2d 181, 190-91, 193 (Cal. 1991) (discussing and rejecting limitation of standing to person with duty of disposal, explaining that "[w]hen misconduct in the provision of funeral-related services occurs in secret and its consequences are not apparent to members of the decedent's family, permitting recovery for the emotional distress suffered by all close family members for whom mortuary services are performed when the misconduct comes to light, regardless of which family member held the statutory right or actually contracted for the services, should be allowed."); *Fox*, 482 P.3d at 900-01 ("As the foundations of the 'quasi-property' doctrine have eroded through time, its application today would serve only as an unreasonable limitation to access to justice. Accordingly, we reject the narrow 'quasi-property' approach to standing."); *cf. Amaker v. King Cnty.*, 540 F.3d 1012, 1015-16 (9th Cir. 2008) (describing "[t]wo general approaches to the problem of who may bring a claim for tortious interference with a corpse," "quasi-property" and "subspecies of the tort of infliction of emotional distress," and certifying question regarding proper approach under Washington law).

conversion claim for interference with a dead body was not viable because the quasi-property right was contrived to allow recovery "not [for] the injury to the dead body itself, but [rather the] emotional or physical pain or suffering to surviving family members."[283] The court therefore "reject[ed] the fictional theory that a property right exists in a dead body that would support an action for conversion. Rather, an injury like that suffered by the Culpeppers is more properly addressed through a tort action related to the infliction of emotional distress or to mental anguish caused by willful, wanton, or insulting conduct, or through an action for breach of contract and accompanying mental suffering."[284]

Several courts have also outright rejected next of kin's conversion claims to recover for harm to a dead body, reasoning that the quasi-property right is non-pecuniary and thus is not sufficient to support a conversion claim. In *Moore v. Regents of University of California*—likely the best known modern case regarding property rights in body parts—the Supreme Court of California, sitting in bank, held that the plaintiff could not maintain a cause of action for conversion with regard to defendants' use of and profit from his spleen.[285] In *Moore*, the plaintiff underwent a splenectomy to treat his hairy-cell leukemia.[286] Before his operation, and

---

[283] 877 P.2d at 880.

[284] *Id.* at 882; *see Boorman*, 236 P.3d at 9-10 (rejecting conversion claim reasoning that "there is [not] a property right in a deceased human body or its remains"); *Walser*, 633 A.2d at 477.

[285] 793 P.2d 479 (Cal. 1990) (in bank).

[286] *Id.* at 480-81.

unbeknownst to Moore, his doctors formed a plan to use portions of the excised spleen in research that was unrelated to Moore's treatment.[287] Over the next several years, Moore's doctors continued to take blood and tissue samples to advance their research.[288] Eventually, researchers "established a cell line from Moore's T-lymphocyte," and obtained a patent on the cell line, entitling Moore's doctors and the University of California to profits obtained therefrom.[289] The cell line proved extremely lucrative.[290] When Moore learned about the value that his cell line had generated, he brought a claim for conversion, among others.

The Supreme Court of California rejected Moore's conversion claim, reasoning that Moore lacked an interest in "excised cells."[291] The court first determined that Moore did not have an ownership interest in his spleen under existing law because that precedent "deal[s] with human biological materials as objects sui generis, regulating their disposition to achieve policy goals rather than abandoning them to the general law of personal property."[292] After considering whether a right could be found in privacy law jurisprudence, the court considered specific property-based theories of ownership, and rejected them. The court first determined that an individual's right to control his own body did not sound in

---

[287] *Id.* at 481.
[288] *Id.*
[289] *Id.* at 481-82.
[290] *Id.* at 482.
[291] *Id.* at 489.
[292] *Id.*

property but rather was rooted in concepts of "'privacy' and 'dignity,'" and further reasoned that a state law controlling the disposal of anatomical remains "eliminates so many of the rights ordinarily attached to property that one cannot simply assume that what is left amounts to 'property' or 'ownership' for purposes of conversion law."[293] Finally, the ultimate patent was not Moore's property because the patent protects "the inventive effort" of the scientists that developed the usable cell line, and not in the underlying material.[294] Other courts have reached similar conclusions.[295]

Not all courts have abandoned the quasi-property rule, however. Several states still find that property-based torts provide workable solutions when exceptions are made for emotional damages. For example, in *Whitehair v. Highland Memory Gardens, Inc.*, the West Virginia Supreme Court continued to apply a quasi-property approach to permit recovery of emotional damages on a claim for "negligent mishandling of the disinterment and reburial."[296] The court approved "the quasi-property rights of the survivors" and acknowledged the viability of an action to recover directly for interference with those rights.[297] But it also took care to

---

[293] *Id.* at 491-92.

[294] *Id.* at 493.

[295] *Bauer v. North Fulton Med. Ctr., Inc.*, 527 S.E.2d 240, 243-44 (Ga. Ct. App. 1999) (accepting quasi-property approach but rejecting conversion claim because the right is "not pecuniary in nature, nor should it be"); *Evanston*, 370 S.W.3d at 385; *see Shults v. United States*, 995 F. Supp. 1270 (D. Kan. 1998) (anticipating Missouri law and following *Culpepper*). *But see Wint v. Ala. Eye & Tissue Bank*, 675 So.2d 383 (Ala. 1996) assuming viability of conversion claim).

[296] 327 S.E.2d 438, 440 (W. Va. 1985).

[297] *Id.* at 441-42.

specifically note that "[a] cause of action for negligent or intentional mishandling of a dead body does not require a showing of physical injury or pecuniary loss. Mental anguish is a sufficient basis for recovery of damages."[298] Similarly, the Georgia courts have continued to hold that actions to recover for harm to a corpse are rooted in the quasi-property rights of next of kin,[299] as have the courts of Virginia and North Carolina.[300]

The case law suggests that the no-property rule may be in the process of retrenchment. Thanks to the availability of new, more apt causes of action and legislatures' codification of the process of burial, courts have turned back to *nullius in bonis* in cases concerning next of kin's rights in their loved-ones' bodies. This trend is not unanimous, however, and it does not tell the full story as it relates to the issue at hand. Societal changes have created new contexts in which the no-property rule must be considered, and these changed circumstances have rendered the modern next of kin cases significantly less persuasive than their pre-1934 counterparts

---

[298] *Id.* at 443.

[299] *Bauer*, 527 S.E.2d at 243 ("[T]his Court has consistently found that a decedent's next of kin has a personal, quasi-property right in his or her corpse to ensure its proper handling and burial."); *see Wages v. Amisub of Ga.*, 508 S.E.2d 783, 784-85 (Ga. Ct. App. 1998); *Bd. of Regents of Univ. of Ga. v. Oglesby*, 591 S.E.2d 417 (Ga. Ct. App. 2003).

[300] *Sanford v. Ware*, 60 S.E.2d 10, 12 (Va. 1950) ("Although there is no right of property in a commercial sense in the dead body of a human being, the right to bury and preserve the remains is recognized and protected as a quasi-property right."); *Ramsey v. Roanoke Mem'l Hosps.*, 33 Va. Cir. 21, 21 (1993) (citing *Sanford* as applicable authority); *Parker v. Quinn-McGowen Co.*, 138 S.E.2d 214, 215-16 (N.C. 1964) ("Our law recognizes that the next of kin has a quasi-property right in the body."); *Norton v. Scotland Mem'l Hosp., Inc.*, 793 S.E.2d 703 (N.C. Ct. App. 2016) (citing *Parker*).

(which arose in the only context possible at the time). Courts and lawmakers who have considered the novel issues that pertain to this case have struggled to develop a coherent approach.

### ii.    Transplantation and Value in Bodies

A common refrain in the cases discussing the quasi-property rule is the supposedly "clear[]" proposition that "there can be no property right in a dead body in a commercial sense, since a dead body cannot be bartered or sold."[301] But modern science has proven that assertion untrue, at least outside of the next of kin context.[302] Organ transplantation has taken off in the last half-century,[303] and with the "newly discovered capacity of [the body's] tissues and organs to cure disease and repair defective bodies,"[304] "the human body [has become] a valuable resource."[305] In fact, "the human body is the most profitable commodity per square inch, more profitable than nearly any other 'property' in the United States."[306] Dead bodies are openly bought and sold—for enormous profit—by "tissue banks," while the market for human reproductive material has similarly flourished.[307] Notwithstanding courts'

---

[301] *E.g.*, *Culpepper*, 877 P.2d at 880; *Sanford*, 60 S.E.2d at 12; *Parker*, 138 S.E.2d at 215; *Bauer*, 527 S.E.2d at 244; *see* Jackson, *supra* note 2, at 120-21.

[302] As noted, the general assertion has not been strictly true for at least several centuries. *See supra* Section III.A.2.b.i.

[303] Goodwin, *Empires of the Flesh*, *supra* note 66, at 1226-31 (describing recent trends in supply and demand of organs for transplantation).

[304] Scott, *supra* note 3, at 14.

[305] *Brotherton*, 923 F.2d at 481 (citing *Moore*, 793 P.2d 479).

[306] Goodwin, *Empires of the Flesh*, *supra* note 66, at 1235.

[307] *Id.* at 1220-24 (describing tissue banks and the industry of trade in human bodies); Goodwin, *The Body Market*, *supra* note 105, at 629, 632.

protestations to the contrary, market forces have rejected the idea that "a dead body cannot be bartered or sold."[308] As this state of affairs has solidified, legislators and courts have used property concepts to grapple with the rights of next of kin and third parties in dead bodies.

The first legal effort to manage newly valuable human remains came with the promulgation of the Uniform Anatomical Gift Act ("UAGA") in 1968.[309] Recognizing the high demand for transplantable organs, like the anatomy acts before it, the UAGA attempted to solve the problem by creating a free source of supply. Sections 2 and 3 of the UAGA provided that "[a]ny individual of sound mind and 18 years of age or more may give all or any part of his body for any purpose" including "medical or dental education, research, advancement of medical or dental science, therapy, or transplantation."[310] The UAGA "established the scope of cadaveric donations, clarified the donation process, and categorized parts of the body for donation. It also provided a legitimate, regulated means for university hospitals and research facilities to supply cadavers, which were needed for medical research purposes."[311] The UAGA was adopted by every state in short order.[312]

---

[308] *See* Goodwin, *Empires of the Flesh*, *supra* note 66, at 1235 ("We should not be stuck on whether to commodify; market realities oblige our recognition that industries are beyond that consideration.").

[309] Unif. Anatomical Gift Act (Unif. L. Comm'n 1968).

[310] UAGA §§ 2, 3 (1968).

[311] Goodwin, *The Body Market*, *supra* note 105, at 619.

[312] Marsh, *supra* note 82, at 64.

In providing that the decedent or her next of kin could decide whether and how to donate the remains, the UAGA implicitly seemed to acknowledge that those individuals had a property-like right in the dead body.[313] As the Supreme Court of Utah explained in dicta, the state's adoption of the UAGA showed that Utah's "legislature has recognized that a person has property rights in his body and can so dispose of his organs."[314] Furthermore, as some scholars noted, "[a]lthough the UAGA does not expressly permit the sale of human bodies, it does not prohibit sales either."[315] Thus, it was theoretically possible to buy and sell body parts under the universally adopted 1968 UAGA regime.[316]

Several years later, however, Congress put the kibosh on organ selling—at least for transplantation purposes. In 1984, Congress passed the National Organ Transplant Act ("NOTA") "[i]n the wake of transparent attempts to introduce markets into the American organ transplant system."[317] The law responded to J.

---

[313] *See* Hardiman, *supra* note 104, at 216-17 ("[W]hile the UAGA cannot be viewed as a blanket acceptance of the human body as property, it does recognize rights in the human body that can be classified as property rights."); Radhika Rao, *Property, Privacy, and the Human Body*, 80 B.U.L. Rev. 359, 378 (2000) ("The 1968 UAGA appears to regard the bodies and body parts of the deceased as property by concentrating control in the hands of their 'owners.'"); *see Onyeanusi v. Pan Am*, 952 F.2d 788, 792 (3d Cir. 1992) ("[T]he very existence of these state laws indicates that there would be a market for human remains in the absence of government intervention.").

[314] *Matter of Moyer's Estate*, 577 P.2d 108, 110 n.4 (Utah 1978); *see Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 384 (Tex. 2012).

[315] Hardiman, *supra* note 104, at 216; Goodwin, *The Body Market*, *supra* note 105, at 618 ("The 1968 UAGA did not foreclose financial compensation for organs or other body parts.").

[316] *See* Goodwin, *The Body Market*, *supra* note 105, at 619 (suggesting based on drafter's comments that "the question regarding payments for organs and other body parts was intentionally left open").

[317] *Id.* at 624; National Organ Transplant Act, Pub. L. No. 98-507, 98 Stat. 2339 (1984).

Barry Jacobs's proposal to "buy[] and sell[] organs from people of color in the Caribbean."[318] The "plan attracted media attention and drew criticism from politicians" focused on "[f]ears associated with slavery, child abductions, and body snatching for organ removal."[319] With the NOTA, Congress made it a crime to "knowingly acquire, receive, or otherwise transfer any human organ for valuable consideration for use in human transplantation if the transfer affects interstate commerce."[320] And a few years after that, the National Conference of Commissioners on Uniform State Laws revised the UAGA to include a similar provision prohibiting "knowingly, for valuable consideration, purchas[ing] or sell[ing] a part for transplantation or therapy, if removal of the part is intended to occur after the death of the decedent."[321]

Although these statutes prohibit selling body parts for transplantation, they "seem[] to permit both the donation of organs for transplant and their sale for other purposes, such as research or education."[322] Moreover, as one commentator has pointed out, by prohibiting the sale of body parts, Congress appears to have implicitly acknowledged that a corpse can be "an 'article of commerce' that lies within the purview of congressional power and would otherwise be subject to sale

---

[318] Goodwin, *The Body Market*, *supra* note 105, at 624.

[319] *Id.*

[320] 42 U.S.C. § 274e.

[321] Unif. Anatomical Gift Act § 10 (Unif. L. Comm'n 1987). Additionally, Section 16 of the 2006 Revised Uniform Anatomical Gift Act contains a similar prohibition on sale of parts "for transplantation or therapy."

[322] Rao, *supra* note 313, at 376.

on the market."[323] Thus, legislative responses to the newfound value in dead bodies and their parts have consistently treated human remains as property.

Courts, on the other hand, have been less steady since the advent of transplantation. Cases involving bodies already in commerce have tended to find that human remains can be property or goods. Transplantation and medical research jurisprudence has been less consistent. In the context of third parties, courts have refused to find that an intended recipient has a property right to donated tissue, but have avoided the question when it relates to an individual with a purely pecuniary stake in the body. As a matter of constitutional law, some courts have continued to find protectible property rights for next of kin, while others reject the proposition. And when cases have involved the state's traditional police powers over dead bodies, courts have been loath to intervene. Divergence similarly pervades in criminal law, both with regard to charged conduct and evidentiary rulings.

In some cases, courts encountering fact patterns involving the commodification of bodies or body parts have readily concluded that the body is property based essentially on simple logic and the facts of the case. In *United States v. Garber*, the United States Court of Appeals for the Fifth Circuit, sitting *en banc*, accepted the proposition that "blood plasma, like a chicken's eggs, a sheep's wool,

---

[323] *Id.*; *see* Goodwin, *The Body Market*, *supra* note 105, at 625 ("NOTA simply served as a very restrictive covenant on organ donation, which allowed companies to bargain, exchange, enter agreements, and otherwise contract to sell human body parts, but left individuals to rely on waitlists and depend upon the blind generosity of others.").

or like any salable part of the human body, is tangible property which in this case commanded a selling price dependent on its value" in a case involving the income tax implications for a defendant who received significant compensation in exchange for her rare blood plasma.[324] Similarly, in *Johnson v. American Airlines* and *Onyeanusi v. Pan Am*, the Ninth Circuit and the Third Circuit held that human remains are "goods" within the meaning of the Warsaw Convention, which regulates international air transportation, largely because the Warsaw Convention was intended to be interpreted broadly and "[h]uman remains can have significant commercial value."[325]

In a case involving a third party's property rights in body parts arising from unsuccessful "direct donation" of the decedent's kidney, several courts to consider the same question came to inconsistent conclusions. In *Colavito v. New York Organ Donor Network, Inc.*, the Honorable Dora Irizarry, writing for the United States District Court for the Eastern District of New York, applied New York common law regarding property rights in body parts and considered the same of other states and held that the intended recipient had no property right in the donated kidney that would support a conversion claim.[326] She reached that conclusion because existing

---

[324] 607 F.2d 92, 97 (5th Cir. 1979) (en banc); *see id.* at 94 n.1 (noting that "[s]ale of her plasma allegedly brought her $80,200 in 1970, $71,400 in 1971, and $87,200 in 1972").

[325] *Johnson v. American Airlines*, 834 F.2d 721, 723 (9th Cir. 1987); *Onyeanusi*, 952 F.2d at 792. *But see Tarar v. Pakistan Int'l Airlines*, 554 F. Supp. 471, 478 (S.D. Tex. 1982) (assuming opposite conclusion based on agreement of the parties).

[326] 356 F. Supp. 2d 237, 241-44 (E.D.N.Y. 2005).

"quasi-property" rights were vested only in the next of kin and only for limited purposes of ensuring a proper burial, and public policy was against finding value in human organs.[327]

On appeal, a panel of the Second Circuit disagreed.[328] The panel explained that "there is by no means a modern consensus that body parts are excluded from conversion actions at common law"[329] and distinguished the issue in *Colavito* from the quasi-property cases because "[t]he control-over-corpse cases restrict the recovery of relatives to emotional distress because that is in fact what they suffered. But a lawsuit based on the loss of a donated organ typically seeks more than compensation for injured feelings. The intended recipient of a human organ does not bring suit for control over a dead body and its constituent parts. He or she sues for the loss of a functioning organ."[330] The panel then looked to New York statutory law, including the UAGA, and found that the legislature's actions could arguably support a donee's property right.[331] Because the question was debatable, the Second Circuit certified the question to the New York Court of Appeals.[332]

---

[327] *Id.* at 242-44.
[328] 438 F.3d 214 (2d Cir. 2006).
[329] *Id.* at 224 (citing *Wint*, 675 So.2d at 384-86 and *Cornelio v. Stamford Hosp.*, 717 A.2d 140, 143 n.6 (Conn. 1998)).
[330] *Id.* at 225.
[331] *Id.* at 225-26.
[332] *Id.* at 227-29.

The New York Court of Appeals held that the intended recipient had no property right in the kidney.[333] The court reached that conclusion based on New York courts' reluctance to apply a property-based rule to support causes of action based on interference with a dead body.[334] Because no New York cases "have strayed meaningfully from the doctrine that there is no common-law property right in a dead body," the "plaintiff, as a specified donee of an incompatible kidney, has no common-law right to the organ," and "his cause of action for conversion must fail."[335] However, the court refused to extend its holding beyond the case: "Considering . . . that the 'no property right' jurisprudence was developed long before the age of transplants and other medical advances, we need not identify or forecast the circumstances in which someone may conceivably have actionable rights in the body or organ of a deceased person."[336] The Court of Appeals also found that New York's adoption of the UAGA did not create a private right of action for the plaintiff, but based its finding on the facts of the case and avoided pronouncing a broad ruling on the issue.[337]

In another certified-question case implicating third-party property rights in dead bodies, the Texas Supreme Court held the question open. In *Evanston*

---

[333] 860 N.E.2d 713, 718-19 (N.Y. 2006).
[334] *Id.* at 718-19.
[335] *Id.* at 719.
[336] *Id.*
[337] *Id.* at 722 ("[B]ecause the kidneys were medically incompatible with plaintiff, he has no private right of action against defendants under the New York Public Health Law.").

*Insurance Co. v. Legacy of Life, Inc.*, the plaintiff insurance company brought a declaratory judgment action in federal court to establish that its policy with Legacy of Life did not reach claims for mistreatment of a dead body under a provision covering "property damage."[338] Legacy of Life invoked the policy when it was sued on allegations that it had received donation of a body for organ harvesting based on promises that the parts would be used "on a nonprofit basis," and then instead "transferred the tissues to a for-profit company, which sold the tissues to hospitals at a profit."[339] A Fifth Circuit panel found that Texas law on the issue was unclear, citing to the state's quasi-property cases and specifically noting that "it is unclear whether the Texas Supreme Court intended its refusal of property rights in dead human bodies to apply with equal force to body parts and organs in an organ donation context."[340] So the panel certified the issue.

The Texas Supreme Court held that the decedent's next of kin lacked a property right in her mother's body that would trigger the insurance policy, but noted that the broader property issue was unsettled.[341] It agreed with the Fifth Circuit panel that "[m]edical science has undisputedly progressed significantly since we classified bodies as quasi property to the next of kin in 1934," and reasoned that Texas's adoption of the UAGA "expanded the common-law quasi property rights of next of

---

[338]  645 F.3d 739, 741-42 (5th Cir. 2011) (per curiam).
[339]  *Id.* at 741-42.
[340]  *Id.* at 748 (and citing the Texas Anatomical Gift Act).
[341]  370 S.W.3d 377 (Tex. 2012).

kin."[342] And, like the New York Court of Appeals in *Colavito*, the Texas Supreme Court was careful to limit its opinion to the question presented, explaining that "whether the tissues were property to an unrelated third party like Legacy—a party whose interest is commercial, not personal—is not a question we must answer here. We therefore express no opinion on that issue and leave that question for another day."[343]

The Sixth Circuit and the Ninth Circuit have found that next of kin have due process property rights in the bodies of their deceased relatives in the context of "presumed consent" laws which empowered the state to remove corneal tissue from corpses without receiving affirmative consent from the decedent or next of kin.[344] In the first of this line of cases, *Brotherton v. Cleveland*, the Sixth Circuit reviewed the common law decisions of Ohio and found that they established a "legitimate claim of entitlement" to the body of the decedent.[345] Although Ohio courts had explicitly rejected a "quasi-property" approach, the Sixth Circuit determined that their application of tort law to provide next of kin with protectible rights of possession and recovery for damage to the corpse established a property right in substance,

---

[342] *Id.* at 384.

[343] *Id.* at 385.

[344] *See also Arnaud v. Odom*, 870 F.2d 304, 308-09 (5th Cir. 1989) (finding a constitutionally protected property interest in a dead body based on Louisiana state statutory law and "quasi-property" jurisprudence).

[345] 923 F.2d at 480; *but see id.* at 483-84 (Joiner, J., dissenting because "Ohio law has made it very clear that there is no property right in a dead person's body").

regardless of "the label attached to a right granted by the state."[346] The panel further reasoned that Ohio's adoption of the UAGA supported its conclusion.[347] Several years later, in *Whaley v. County of Tuscola*, the Sixth Circuit extended its *Brotherton* holding to Michigan.[348] Following the analysis in *Brotheron*, the *Whaley* panel reviewed Michigan law holding that next of kin have a protectible right of possession in the corpse of a family member and the state's adoption of the UAGA and concluded that "Michigan provides the next of kin with a constitutionally protected property interest in the dead body of a relative."[349]

In *Newman v. Sathyavaglswaran*, the Ninth Circuit followed the Sixth Circuit and found that next of kin have a due process property right in a relative's corpse under California law.[350] The Ninth Circuit reviewed the history of the no-property rule, both nationally and in California, and reasoned that "California courts commonly use the term 'quasi property' to describe the rights of next of kin to the body of the deceased."[351] Based on that jurisprudence, the panel concluded that "[u]nder traditional common law principles, serving a duty to protect the dignity of the human body in its final disposition that is deeply rooted in our legal history and social traditions, the parents had exclusive and legitimate claims of entitlement to

---

[346] *Id.* at 480-82.

[347] *Id.* at 482.

[348] 58 F.3d 1111 (6th Cir. 1995).

[349] *Id.* at 1115-16. *But see Georgia Lions Eye Bank, Inc. v. Lavant*, 335 S.E.2d 127, 128 (Ga. 1985); *State v. Powell*, 497 So.2d 1188, 1192 (Fla. 1986).

[350] 287 F.3d 786 (9th Cir. 2002).

[351] *Id.* at 792-94.

possess, control, dispose and prevent the violation of the corneas and other parts of the bodies of their deceased children."[352] That common law right, paired with California's adoption of the UAGA, established sufficient "components of the group of rights by which property is defined," to establish "parents['] . . . property interests in the corneas of their deceased children protected by the Due Process Clause of the Fourteenth Amendment."[353]

Yet in related cases where a state has taken or interfered with body parts outside of the transplantation context and in accordance with its more traditional police functions, courts have reached a different answer to the property question. In *Albrecht v. Treon*, the Sixth Circuit, applying Ohio law, concluded that next of kin did not have a property right in parts of a dead body that had been removed in the course of an autopsy.[354] The District Court in *Albrecht* had certified the question to the Ohio Supreme Court, which held against a property right based on provisions of the state autopsy law and distinguished the case from *Brotherton* by pointing to *Brotherton*'s roots in the UAGA.[355] The Sixth Circuit reached the same result in

---

[352] *Id.* at 796.

[353] *Id.* at 796-97. *But see Perryman v. Cnty. of Los Angeles*, 63 Cal. Rptr. 3d 732, 740 (Cal. Ct. App.) *vacated* 171 P.3d 2 (Cal. 2007) (criticizing *Newman* as "rewrit[ing]" state law and "shrugg[ing] off over 100 years of California case authority").

[354] 617 F.3d 890, 893 (6th Cir. 2010).

[355] 889 N.E.2d 120, 123-24 (Ohio 2008).

another autopsy case two years later after certifying the question to Michigan's
Supreme Court, which drew the same autopsy/donation distinction.[356]

Drawing on this tension, in *Shelley v. County of San Joaquin*, Chief Judge
Morrison England, writing for the United States District Court for the Eastern
District of California, held that "next of kins' property interest in the remains of their
relatives" was unsettled as of 2012.[357] In *Shelly*, the plaintiffs brought a section 1983
suit to recover when San Joaquin officials exhumed bodies discovered at the bottom
of an abandoned well in the course of a murder investigation.[358] The officials used a
back hoe in the exhumation which "caused the skeletal remains of Jo Ann Hobson
. . . to be chewed up, pulverized, destroyed, crushed and commingled with other
unknown murder victims."[359] Chief Judge England held that the officials were
entitled to qualified immunity because "[t]he few U.S. Courts of Appeals that have
considered the question have sharply divided" and state courts in California had
stated the "no property" rule and had not adopted a property or quasi-property
approach.[360]

Cases in other legal contexts are also divergent. In *People v. Gayton*, a
criminal case decided after the New York Court of Appeals's certified-question

---

[356] *Waeschle v. Dragovic*, 687 F.3d 292, 294-95 (6th Cir. 2012) (quoting *In re Certified Question
from U.S. Dist. Ct. for E. Dist. Of Mich.*, 793 N.W.2d 560, 561 (Mich. 2010)).
[357] 954 F. Supp. 2d 999, 1004 (E.D. Cal. 2013).
[358] *Id.* at 1000-01.
[359] *Id.* at 1001.
[360] *Id.* at 1004.

decision in *Colavito*, the New York Appellate Division dismissed a criminal indictment on the basis of the no-property rule.[361] The defendant in *Gayton* ran a funeral home and had removed tissue from several cadavers and provided it to a tissue procurement agency for a fee without obtaining consent from the next of kin.[362] The state charged him with scheme to defraud, which required it to prove that the defendant "obtain[ed] property from" a defrauded victim.[363] The Appellate Division dismissed the indictment, reasoning, based solely on *Colavito*—and without grappling with express limitation of that case's holding—that a human body cannot be property.[364] In contrast, in Pennsylvania, in *Commonwealth v. Mastromarino*[365] and *Commonwealth v. Garzone*,[366] the defendants pled guilty to hundreds of counts of "theft by unlawful taking (of body parts)."[367] Their convictions and sentences stood following appeal despite the fact that the applicable statute requires proof that the defendant "unlawfully t[ook], or exercise[d] unlawful control over, movable property of another with intent to deprive him thereof."[368]

Similar results obtain in the Fourth Amendment search and seizure context. In another autopsy case, *People v. Roehler*, the California Court of Appeals held that

---

[361] 82 A.D.3d 1595 (N.Y. App. Div. 2011).
[362] *Id.* at 1596.
[363] *Id.*
[364] *Id.* at 1596-97.
[365] No. CP-51-CR-012750-2007 (Pa. Ct. C.P. Phila. Cnty. 2007).
[366] *See* 34 A.3d 67 (Pa. 2012).
[367] *Id.* at 68.
[368] 18 Pa. Cons. Stat. § 3921(a).

common law principles such as the "quasi-property" right in a dead body and the availability of suit for next of kin to recover for mistreatment of the body of a decedent established "a reasonable expectation of privacy in the next of kin with respect to dead persons" which entitled the body to Fourth Amendment protection.[369] And in *United States v. Rathburn*, the Honorable Paul D. Borman, writing for the United States District Court for the Eastern District of Michigan, upheld the validity of a search warrant describing human body parts as evidence of federal crimes including, *inter alia*, section 2314.[370] But in *Everman v. Davis*, the Court of Appeals of Ohio rejected the Fourth Amendment's application to a dead body because "[t]he word 'effects' in legal and common usage includes real or personal property and as used in the Constitution does not necessarily include the right of immediate possession of the dead body of a human being."[371]

The viability of transplantation and the corresponding increase in the value of human bodies has led lawmakers and some courts to begin regarding bodies as property in situations where the relevant actors have done so. More broadly, courts considering application of the no-property rule in contexts outside of the traditional next of kin tort claims, and particularly in cases implicating organ donation, have been forced to attempt to square the no-property rule with factual circumstances in

---

[369] 213 Cal. Rptr. 353, 375-76 (Cal. Ct. App. 1985).
[370] No. 16-CR-20043, 2016 WL 5928802, at *2-3 (E.D. Mich. Oct. 11, 2016).
[371] 561 N.E.2d 547, 550 (Ohio Ct. App. 1989).

which seemingly everyone has acted in accordance with the view that bodies are property. In trying to resolve this contradiction, courts to consider the question have reached widely disparate results. Moreover, the law has largely avoided answering the question presented in this case: whether a body is property in the hands of a third party whose interest is purely pecuniary.

### iii.    Application

Having reviewed developments in history and the law from the passage of section 2314 to the time of Maclean's conduct, I must now return to the statute and determine whether the common law provides an answer to the question at issue: whether the ordinary meaning of "goods, wares, and merchandise" includes human remains.

I conclude that the common law as of 2020-21 is generally ambivalent on this question. The quasi-property rule that had appeared well-established as of 1934 faded from utility in most jurisdictions as statutory schemes and modern tort theories provided more efficient solutions to the problems the rule was developed to solve. But this trend back toward the no-property rule is discernible primarily in the context of tort actions brought by next of kin.[372] In parallel, medical advances made human bodies and tissues incredibly valuable for use in transplantation and scientific

---

[372] As noted, given the significant changes in the utility of dead bodies and the rise of third-party commodification since 1934, the Court views the modern next of kin cases as significantly less persuasive than the similar pre-1934 cases. *Supra* at 72-73. Courts have recognized that the modern next of kin rules may not be transferable to third parties with different interests.

research. With those developments, a large-scale market has arisen in which dead bodies or tissues are traded, sold, or even temporarily rented out, all for enormous profit. Lawmakers have partially embraced this state of affairs, banning the sale of organs for transplantation in the UAGA and NOTA but implicitly permitting sales for other purposes and, at a fundamental level, acknowledging that bodies can be and are bought and sold. Courts dealing with cases implicating this novel state of affairs have struggled to square any of the historical approaches to property in dead bodies—either no-property or quasi-property—to circumstances involving the full-scale commodification of human remains.

In the face of this ambiguity in the common law, the Court again turns to the legislative history to aid in interpretation.[373] And, as before, the legislative history suggests that cadavers are within the scope of section 2314. The United States Supreme Court has repeatedly considered Congress's intent in passing the NSPA and consistently explained that it "contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful get away and thus make the state's detecting and punitive processes impotent."[374] Specifically, the NSPA was generally intended to federalize "felonious taking" crimes that crossed

---

[373] *See Everett*, 700 F.2d at 905; *Stevens*, 70 F.4th at 657.

[374] *United States v. Sheridan*, 329 U.S. 379, 384 (1946); *Smith*, 686 F.2d at 245 (NSPA passed because "there was a need to federalize certain crimes in order to aid the states.").

state lines.[375] The Court has described this purpose as "broad" and counseled against interpreting the statute to "hobbl[e] federal prosecutors in their effort to combat crime in interstate commerce."[376]

Every state has prohibited, in some form or another, taking a corpse or human remains without legal authority.[377] And, as noted, a cadaver is a tangible object, subject to transportation. Against the backdrop of graverobbing, and with the added color of a large-scale economic market in human remains, Congress's "broad" intent in enacting the NSPA indicates that "goods, wares, and merchandise" should be read to include dead bodies.

Furthermore, if one contends that the statutory phrase "goods, wares, and merchandise" is sufficiently "dynamic" for uncertainty in the common law to undo its relatively settled meaning, one must also accept that those "words . . . can enlarge or contract their scope as . . . changes . . . in the world[] require their application to new instances or make old applications anachronistic."[378] This Court appears to be the first to directly address the no-property rule's application to the "new instance[]" of a third party who has wrongfully acquired the remains in question and used them in commerce: American courts may be in the midst of a maelstrom of deciding whether and how to apply the resurgent no-property rule to the rights of individuals

---

[375] *Smith*, 686 F.2d at 244 (quoting *Turley*, 352 U.S. at 413).
[376] *Moskal*, 498 U.S. at 110; *McElroy*, 455 U.S. at 655.
[377] *See* Marsh, *supra* note 82, at 82-83 (generally describing relevant statutes and common law).
[378] *West*, 527 U.S. at 218.

in their own body parts and next of kin in their dead, but those debates have largely missed the rule's criminal application.[379] Moreover, the case law has explicitly avoided addressing how the no-property rule applies to the previously unimaginable situation of "an unrelated third party . . . whose interest [in the body] is commercial, not personal."[380]

In this new context, the Court concludes that the no-property rule should not apply for two reasons. First, the rule has still rarely been employed in criminal cases. Notwithstanding the cursory reasoning in *Gayton*, courts have not permitted defendants to use the no-property rule as a shield to protect themselves from the consequences of mishandling human remains.[381] And that makes sense. A rule limiting the permissible uses of human remains simply has no application in a case involving uses that exceed those limits. So although the common law property status of a dead body is ambiguous in general, it is criminally clear: a criminal defendant who treats a body as property is liable for the consequences of doing so wrongfully.[382]

---

[379] *But see Gayton*, 82 A.D.3d 1595 (dismissing indictment based on no-property rule).

[380] *Evanston Ins. Co.*, 370 S.W.3d at 385; *see Colavito*, 860 N.E.2d at 719 ("Considering, however, that the 'no property right' jurisprudence was developed long before the age of transplants and other medical advances, we need not identify or forecast the circumstances in which someone may conceivably have actionable rights in the body or organ of a deceased person.").

[381] *Lynn*, 100 Eng. Rep. 394; *Cooley*, 27 Mass. 37; *Meek*, 185 N.E. 899*; see Thompson*, 58 S.W. 213; *Lowe*, 50 P. 912; *Garzone*, 34 A.3d 67.

[382] *See Koerber v. Patek*, 102 N.W. 40, 43 (Wis. 1905) ("We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed;

Second, "changes . . . in the world[]" demand this result.[383] Third parties like Katrina Maclean have already rejected the no-property rule. They have decided that they are free to treat a corpse as their property; to chop it up and sell the parts for profit; to advertise it as their merchandise; to keep it in their personal collections.[384] Applying the no-property rule, rooted in the fundamental idea that "[t]he body in a commercial sense was devoid of market value"[385] to changed circumstances in which that foundation is destroyed would lead to fundamentally "anachronistic" results.[386] And those results have never been the rule. As the Supreme Court of Georgia explained more than a century ago: "It certainly cannot be said that a corpse is sufficiently property . . . to receive and accept pay for it[] . . ., but is not sufficiently property to authorize a recovery for a breach of duty arising therefrom, or to prevent any duty from arising under such circumstances."[387] That proposition holds today.[388]

---

. . . certainly none where the law need less hesitate to impose upon a willful violator responsibility for the uttermost consequences of his act.").

[383] *West*, 527 U.S. at 218.

[384] *See Brotherton*, 923 F.2d at 481 (describing "market place [of] human tissues"); Goodwin, *The Body Market*, *supra* note 105, at 629; Doc. 112 at 1 ("[Maclean] is part of a legal, nationwide oddities community that collects body parts.").

[385] *Johnson's Estate*, 7 N.Y.S. 2d at 84.

[386] *West*, 527 U.S. at 218.

[387] *Louisville & N.R. Co.*, 51 S.E. at 28; *see* Section III.A.2.b.i (describing bodysnatching legislation).

[388] *Cf. Onyeanusi*, 952 F.2d at 792 (noting existence of a market in human remains and holding that dead bodies are "goods" under Warsaw Convention when airlines receive value for shipping them); National Organ Transplant Act, Pub. L. No. 98-507, 98 Stat. 2339 (1984) (banning organ selling for transplantation in response to public outcry against the prospect of such a market).

Whatever the ultimate scope of the no-property rule, a person whose conduct contradicts it sacrifices any protection it may offer. Thus, the terms "goods, wares, and merchandise" in section 2314 are sufficiently broad to include human remains when the allegations show that those remains were treated as property.

*    *    *

In sum, the Court concludes, based on statutory text, judicial common law and statutory precedent, history, legislative purpose, and common sense, that the law recognizes sufficient property rights in dead bodies for them to be considered "goods, wares, and merchandise" pursuant to 18 U.S.C. § 2314 when the remains at issue have been taken by a third party and used commercially. The Court does not hold that a corpse is property in any context other than the instant statutory question. Moreover, to be clear, the Court's holding does not outlaw the purchase or sale of human remains.[389] The statute proscribes dealing in *stolen* property—Maclean was indicted not for collecting human remains, but for dealing in parts that she knew were wrongfully taken from the HMS Morgue.[390] This decision reaches no further.

Finally, a brief word about lenity. The rule of lenity holds that "[a]mbiguity in a statute defining a crime or imposing a penalty should be resolved in the defendant's favor."[391] But the rule "applies only when, after consulting traditional

---

[389] *Cf.* Doc. 112 at 1 (averring that Maclean is part of a "*legal*, nationwide oddities market") (emphasis added).
[390] *See* Doc. 1 ¶ 23.
[391] Scalia & Garner, *supra* note 31, at 296.

canons of statutory construction, we are left with an ambiguous statute."[392] Before applying the rule of lenity, a court should look to a statute's "'language and structure, legislative history, and motivating policies,'" and proceed to rely on lenity only if, having exhausted "every thing from which aid can be derived," "a reasonable doubt persists."[393] Here, the traditional methods of statutory interpretation have answered the question at hand, so the rule of lenity has no role to play.

## B.    Value of Goods

Having determined that human remains are actionable under section 2314, I next turn to Maclean's argument that the indictment fails to allege the minimum jurisdictional value of $5,000 of stolen goods.[394] Maclean contends that the amount is not met because "human remains do not have any compensable value," and the indictment does not identify specific stolen body parts and their individual values cannot be aggregated.[395]

"Value" in section 2314 is defined as "the face, par, or market value, whichever is the greatest" of the goods, and "the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall

---

[392] *Shular v. United States*, 589 U.S. 154, 165 (2020); Scalia & Garner, *supra* note 31, at 299 ("[W]hether, after all the legitimate tools of interpretation have been applied, 'a reasonable doubt persists.'").

[393] *Moskal*, 498 U.S. at 108 (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980) and *United States v. Bass*, 404 U.S. 336, 347 (1971)); *United States v. Heinrich*, 57 F.4th 154, 163 (3d Cir. 2023) (Bibas, J.) (quoting *Moskal*, 498 U.S. at 108).

[394] Doc. 112 at 9-11.

[395] *Id.*

constitute the value thereof."[396] The aggregation approach was affirmed by the Supreme Court in *Schaffer v. United States*, where it held that the value of individual shipments may be aggregated to meet the $5,000 requirement "where the shipments have enough relationship so that they may properly be charged as a single offense."[397]

This definition would appear to immediately sink Maclean's second argument. Indeed, she essentially abandons it in reply, acknowledging that the statutory definition "may be persuasive."[398] She instead shifts her argument to contend that "[t]he transactions that allegedly occurred here were separate and distinct" such that they are not sufficiently related to be charged as a single count.[399] That simply ignores the allegations of the indictment, which claims that Maclean, Lodge, and Pauley were engaged in an ongoing business relationship for the sale of human remains, and all of the relevant sales were charged in a single count which spans only a three-month period.[400] That is a sufficient relationship for aggregation.

Maclean's argument that "remains do not have any compensable value" also fails in the face of the statutory definition. The value of goods is based on the "face, par, or market value, whichever is the greatest."[401] So even if as a general matter the

---

[396] 18 U.S.C. § 2311.
[397] 362 U.S. 511, 517 (1960).
[398] Doc. 125 (Reply) at 7.
[399] *Id.*
[400] Doc. 1 ¶¶ 25-28, 30.
[401] 18 U.S.C. § 2311.

law rejects value in body parts, if the market says different, it controls. Under section 2314, "market value means actual market value and not a theoretical or intrinsic value; prices realized in sales are the best evidence of that market value."[402] Maclean realized a profit of at least $8,800 and paid at least $600 in her transactions for body parts.[403] Those allegations demonstrate that the market value of the remains in this case exceeded $5,000, and the indictment is valid.

Finally, the Court's decision in *United States v. Pauley* is not to the contrary.[404] In *Pauley*, the Court confronted the distinct question of whether the human remains in that case could support a sentencing enhancement under United States Sentencing Guideline § 2B1.1(b)(1).[405] The Guideline provides for an increased offense level based on the amount of the "loss" to the victims of the crime.[406] The Court held that the Guideline did not apply because the victims did not suffer any "pecuniary loss."[407] As the Court's reasoning in *Pauley* made clear, "value and loss are not the same thing . . . in this case the value of the goods is determined, not by their value to the victims, but their value to Pauley," while the Guideline at issue was focused on the opposite: "the victim's loss."[408] Accordingly, *Pauley* does not a preclude a finding of value for the purposes of satisfying section 2314.

---

[402] *United States v. Simpson*, 577 F.2d 78, 80 (9th Cir. 1978).
[403] Doc. 1 ¶¶ 25, 30.
[404] No. 23-CR-0163, 2024 WL 3939557 (M.D. Pa. Aug. 26, 2024).
[405] *Id.* at *1.
[406] USSG § 2B1.1(b)(1).
[407] *Pauley*, 2024 WL 3939557, at *7.
[408] *Id.* at *5.

The indictment alleges that Maclean engaged in a series of related transactions in human remains with the same counterparties over a short period of time. The market value of those transactions totaled more than $5,000. The indictment charged all of the sales as a single count. On those allegations, the indictment is sufficient, and Maclean's motion to dismiss is denied.

## C.    Grand Jury Materials

Finally, Maclean argues that the indictment should be dismissed or that she should be permitted to review the grand jury proceedings because "the Indictment in this case seriously misrepresents the facts and the law, or otherwise omitted other crucial facts, as to what constitutes property and the monetary jurisdictional requirements."[409] This argument fails on its own terms. An indictment cannot be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury."[410] Moreover, Maclean nowhere identifies facts in the indictment that she contends are outright untrue, nor does she describe facts that were misrepresented.[411] Instead, this argument appears to be a restatement of the position

---

[409]  Doc. 112 at 12-14.

[410]  *United States v. Williams*, 504 U.S. 36, 54 (1992) (quoting *Costello v. United States*, 350 U.S. 359, 363-64 (1956)); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988) ("[T]he mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment.").

[411]  Maclean makes no factual argument in her briefing on the "property" question, and in her jurisdictional threshold briefing she only contends that the Government did not allege the values of individual items. *See* Doc. 112. In her Reply, Maclean tries to recast her legal arguments as evidentiary ones. Doc. 125 at 7 (complaining about "the evidence presented that human remains constitute property under § 2314"). The Court is not fooled.

that the facts alleged do not establish a violation of the statute under Maclean's interpretation of the law.[412] I have rejected Maclean's interpretation and held that the allegations in the indictment, taken as true, establish a violation of the statute. On this basis, there is nothing to suggest that the Government presented anything remotely improper to the grand jury. That conclusion also defeats Maclean's motion for access to the grand jury proceedings, because she has failed to show "that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."[413] Accordingly, Maclean's motion to dismiss the indictment or for access to the grand jury proceedings is denied.

## IV.    CONCLUSION

The Court today holds, based on a review of the statutory text, relevant common and statutory law, historical record, social circumstances, and legislative history and intent, that 18 U.S.C. § 2314 prohibits interstate transportation of human body parts when they have been taken without authorization and treated as property by the perpetrator. But the difficulties involved in arriving at that answer highlight the law's failure to meet reality.

---

[412] Doc. 112 at 13 (repeatedly suggesting that government misrepresented "the law").

[413] Fed. R. Crim. P. 6(e)(3)(E)(ii); *see United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) ("To support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy." (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1957)).

In cases involving cadavers, courts throughout this country continue to treat as foundational a concept derived centuries ago for use in an alien judicial system and itself rooted in beliefs about value and utility that were questionable at the time and are patently incorrect today. As progress has changed our legal systems, moral conceptions, and practical circumstances, the anachronistic no-property rule has often served only to complicate the application of what is essentially a straightforward and universal principle: unauthorized interference with a dead body is not permitted and is both criminally and civilly actionable.[414] Furthermore, when problems have arisen, courts have hesitated to rethink the rule's viability—either out of deference to its credentials or concern about interfering with matters as sensitive as death[415]—and have instead devised *ad hoc* solutions like the quasi-property rule. Similarly, legislatures have largely acted in response to specific issues generating

---

[414] *See, e.g.*, *Pierce*, 10 R.I. at 237-38 & n.1 ("There is a duty imposed by the universal feelings of mankind to be discharged by some one towards the dead; a duty, and we may also say a right, to protect from violation; and a duty on the part of others to abstain from violation; it may therefore be considered as a sort of *quasi-property*, and it would be discreditable to any system of law not to provide a remedy in such a case." And stating that "It was an offence at common law to remove a body."); *Koerber*, 102 N.W. at 43.

[415] *See Louisville & N.R. Co.*, 51 S.E. at 25 ("Death is unique. It is unlike aught else in its certainty and its incidents. A corpse in some respects is the strangest thing on earth. A man who but yesterday breathed and thought and walked among us has passed away. Something has gone. The body is left still and cold, and is all that is visible to mortal eye of the man we knew. Around it cling love and memory. Beyond it may reach hope. It must be laid away. And the law—that rule of action which touches all human things—must touch also this thing of death. It is not surprising that the law relating to this mystery of what death leaves behind cannot be precisely brought within the letter of all the rules regarding corn, lumber and pig iron.").

public attention, like bodysnatching[416] or organ donation,[417] without comprehensively considering the subject and all its possibilities. This reticence to alter the law of dead bodies has left the legal system in a perpetually reactive posture, in which courts have often been given the primary duty of reshaping inadequate concepts to defend widely accepted values against previously unimaginable incursions.

Today, the ultimate result of this state of affairs is an extensive legal gray area, wherein courts repeatedly insist that bodies cannot be commercial property because they lack pecuniary value and "cannot be bartered or sold,"[418] while businesses incorporate, trade publicly, and become immensely profitable doing just that.[419] Courts that have recognized this disconnect have so far avoided resolving it.[420] By lagging so far behind reality, the law has once again opened the door for bad actors to exploit the lack of regulation for personal gain, just as it did two centuries ago.

---

[416] *See, e.g.*, An Act to Prevent the Odious Practice of Digging Up and Removing for the Purpose of Dissection, Dead Bodies Interred in Cemeteries or Burial Places, L. 1789, ch 3 (N.Y. Sess. 12) (1789) (later codified at N.Y. Pub. Health. L. §§ 4216-4218).

[417] *See* Unif. Anatomical Gift Act (Unif. L. Comm'n 1968); National Organ Transplant Act, Pub. L. No. 98-507, 98 Stat. 2339 (1984).

[418] *See, e.g.*, *Culpepper*, 877 P.2d at 880.

[419] *See* Goodwin, *Empires of the Flesh*, *supra* note 66, at 1220, 1224; *Brotherton*, 923 F.3d at 481 (describing "a market place in which human tissues are routinely sold to and by scientists, physicians and others.").

[420] *See Evanston Ins. Co.*, 370 S.W.3d at 385 (noting open question of "whether the tissues were property to an unrelated third party"); *Colavito*, 860 N.E.2d at 719.

And such exploitation is far from isolated. Cases involving improper or questionable organ and body selling abound and are sure to continue.[421] As the above analysis has illustrated, existing legal concepts are poorly positioned to resolve these problems, and in the last half-century the common law of dead bodies has devolved into a morass of confused and contradictory results.

---

[421] *See, e.g. Christensen*, 820 P.2d at 185-86 (allegations that defendants "mishandled and mutilated remains, commingled human remains," "removed and 'harvested,' without authorization or permission, numerous human organs and body parts from plaintiffs' decedents' remains," including "the unauthorized taking of Plaintiffs' decedents' corneas, eyes, hearts, lungs and other organs, and bones and body parts, which were sold for Defendants' profit.'"); *Conroy v. Regents of Univ. of Cal.*, 203 P.3d 1127, 1130-31 (Cal. 2009) (allegations "that defendant was using cadavers donated under the Willed Body Program for unauthorized purposes, including private for-profit tutoring classes and the transport and dismembering of bodies for profit"); *Gayton*, 82 A.D.3d at 1596 (allegations that "Defendant was a licensed funeral director and the owner of a funeral home, and he entered into an agreement with BTS [(Biomedical Tissue Services, a human tissue procurement agency)] whereby BTS would obtain consent from the next of kin of the decedents and would provide defendant's funeral home with a 'facility fee' for the recovery of bone and tissue. BTS subsequently recovered tissue and/or bone from two decedents at defendant's funeral home without the consent of their next of kin. Defendant received money from BTS in connection with those recoveries, as well as money from the decedent's next of kin for services rendered by the funeral home."); *Garzone*, 34 A.3d at 68 (criminal case also involving BTS in which defendants "agreed to provide cadavers from [their] business to [BTS] for $1,000 each. The arrangement was undertaken without the knowledge or consent of the families of the deceased . . . [involving] at least 244 cadavers . . . for which [defendants] received over $245,000."); *United States v. Rathburn*, 771 F. App'x 614, 618 (6th Cir. 2019) (defendant operated business in which he obtained cadavers "to rent to medical professionals for medical or dental training courses"); *Aloia v. Gore*, 506 P.3d 34, 36 (Ariz. Ct. App. 2022) (defendant operated business—Biological Resource Center ("BRC")—which "accepted donated bodies and supplied specimens to medical, academic, and research facilities. It represented that it would not sell any of the bodies but would accept a processing fee from requesting institutions. Contrary to that representation, however, BRC sold the donated specimens. In addition, some specimens that BRC distributed were contaminated."); *Hess*, 106 F.4th at 1019 (defendants operated business to "harvest human remains—such as heads, torsos, arms, legs, and entire human bodies—and market them for sale to customers who used the remains for scientific, medical, or educational purposes" and sold the bodies or body parts of at least 811 individuals, 560 of which "were almost certainly obtained and sold by fraudulent means").

Balancing humanity's interest in protecting human remains against permitting cadavers' productive and enormously beneficial use in research and transplantation is a challenge that cries out for legislative resolution. And the viability of the no-property rule must be confronted in the process. "[W]e may not *like* discussing the human body in market-like terms, with values and assessments. However, market realities in the body already exist and our failure to recognize this has its own set of consequences, including a sorely lacking and undeveloped nomenclature, the exploitation of human subjects, a loosely monitored but robust market in buying and selling purloined human tissues, and an expanding, conflicting common law."[422] It is beyond time for the law to confront this problem.

My purview, however, is far narrower. As stated, for the foregoing reasons, I conclude that the phrase "goods, wares, and merchandise" in 18 U.S.C. § 2314 should be interpreted to include human remains when they have been treated as property by the defendant. Those are the allegations here, so the indictment is sufficient. The indictment also adequately alleges that Maclean engaged in a series of related transactions with an aggregate value of $5,000. Finally, there is no evidence of any malfeasance in the grand jury process. Accordingly, Katrina Maclean's motion to dismiss the indictment is denied.

---

[422] Goodwin, *Formalism and the Legal Status of Body Parts*, *supra* note 105, at 319.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge