IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : |
| | : No. 4:23-CR-159 |
| KATRINA MACLEAN, | : |
| | : |
| Defendant. | : (Chief Judge Brann) |

**DEFENDANT'S SENTENCING MEMORANDUM AND**
**MEMORANDUM IN SUPPORT OF OBJECTIONS TO PRE-SENTENCE REPORT**

Defendant Katrina Maclean, by and through her undersigned counsel, hereby submits this Memorandum in support of her objections to the Pre-Sentence Report and in aid of sentencing.

## PRELIMINARY STATEMENT

The peculiar facts of these proceedings are well known. This sensational case has garnished national attention ranging from its macabre subject matter underlying the criminal charges to the shocking negligence of one of the most pre-eminent schools of higher education in America.[1] Ms. Maclean

[1] Harvard's colossal failure in operating and overseeing its morgue is the subject of a class action lawsuit brought by relatives of those deceased individuals who donated their bodies for anatomical research to Harvard Medical School. The Massachusetts Supreme Judicial Court noted the egregiousness of Harvard's conduct stating:

> Harvard failed to act in good faith in operating and overseeing the morgue. Despite the risk of harm being known to Harvard, as similar misconduct had previously occurred in a strikingly similar fashion in another

is the last of four defendants to be sentenced in this case. Along with the three other indicted co-defendants in this case, and a couple of other related cases in the Middle District of Pennsylvania, Katrina Maclean and the others have the unfortunate distinction of apparently being the first and only individuals in United States history to be prosecuted solely with buying and selling human remains under a property statute, Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314.

---

> medical school morgue, there were little to no controls in place to prevent this harm from occurring at Harvard. Instead, according to the allegations, an unsupervised Lodge was able to dismember the donated bodies; bring unauthorized people into the morgue to inspect and purchase body parts, including during working hours; and carry body parts out of the morgue for years. Other red flags, such as his license plate describing himself as the "Grim-R[eaper]," which revealed an unprofessional insensitivity given his position in a medical school morgue, were also ignored or tolerated. Thus, Harvard's extraordinary failure to adequately supervise the morgue's operations and properly protect the donated remains in its care exemplifies the kind of "peculiarly pervasive noncompliance" we have said can demonstrate a lack of good faith . . . .
>
> Harvard may, however, be held responsible for its own misconduct. It had a legal obligation to provide for the dignified treatment and disposal of the donated human remains, and failed miserably in this regard, as Harvard itself recognized. Harvard also had a duty to oversee Lodge's conduct and to place proper controls over the morgue itself—both of which it allegedly disregarded for years.

Weiss v. President and Fellows of Harvard College, 267 N.E.3d 544, 555-56 (Mass. 2025).

Although Katrina Maclean's circumstances may be seemingly similar to her co-defendants, there are critical distinctions that counsel in favor of a different outcome.

## RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 13, 2023, an indictment was returned charging Ms. Maclean and three other individuals with one count each of Conspiracy, pursuant to 18 U.S.C. § 371 (Count 1) and Interstate Transport of Stolen Goods, pursuant to 18 U.S.C. § 2314, § 2 (Count 3).[2] In substance, the Indictment alleged that Cedric Lodge, who was the lab manager of the Harvard Medical School morgue ("Harvard"), stole dissected portions of donated human cadavers used for medical school education, teaching and research and sold them to oddity collectors, including Ms. Maclean. The Indictment further alleges that Ms. Maclean sold various human remains she purchased from Mr. Lodge.

On June 14, 2023, Ms. Maclean was arrested at her home. On that same date, she appeared for her initial appearance in federal court in the District of Massachusetts and was released on pre-trial supervision and other various conditions. On June 27, 2023, Ms. Maclean appeared for arraignment in the Middle District of Pennsylvania, entered a not guilty plea and was again released on the same pre-trial conditions.

[2] 18 U.S.C. § 2314 is commonly known as the National Stolen Property Act.

On December 8, 2025, Ms. Maclean entered a guilty plea before this Court pursuant to a negotiated plea agreement. The terms of the plea agreement included a conditional guilty plea to Count 3, whereby Ms. Maclean retained the right to appeal the denial of her motion to dismiss the indictment.[3] In addition, the Government would recommend 12 months of imprisonment, although Ms. Maclean retained the right to argue for a sentence below 12 months.

A Pre-sentence Report (the "PSR") was ordered and prepared. In its PSR, Probation determined that the base offense level was 6, but added two points for being in the business of selling and receiving stolen property pursuant to USSG 2B1.1(b)(4). Applying a two-level reduction for acceptance of responsibility and a two-level reduction for being a zero-point offender, Ms. Maclean's total offense level was a 4. Probation determined that Ms. Maclean's advisory guideline range was 0 to 6 months. PSR ¶ 62.

On February 9, 2026, Ms. Maclean filed two substantive objections to the PSR, namely, challenging the two-point enhancement for allegedly being in the business of selling and

[3] Among other things the motion to dismiss challenged whether human remains constituted property under the applicable statute. (ECF Doc. 111 & 112). In a 104-page opinion, the Court dismissed that motion. (ECF Doc. 145).

receiving stolen property and the application of an upward departure/variance.

Sentencing is scheduled for August 18, 2026. Accordingly, this sentencing memorandum is being submitted in support of Ms. Maclean's objections to the PSR and to address the salient 3553(a) factors in support of a guideline and non-incarceration sentence.

**ARGUMENT**

**I.**

**MS. MACLEAN'S OBJECTION TO THE TWO-LEVEL ENHANCEMENT UNDER USSG § 2B1.1(b)(4) SHOULD BE SUSTAINED**

It is well-settled that the Government always bears the burden of proving by a preponderance of the evidence the facts to support a sentencing enhancement and that "the defendant does not have to prove the negative to avoid the enhanced sentence." United States v. Diallo, 710 F.3d 147, 151 (3d Cir. 2013).

USSG § 2B1.1(b)(4) provides a two-level enhancement where the defendant is in the business of selling and receiving stolen property. In determining whether this enhancement applies, the Guidelines require that the sentencing court consider various factors including:

(A) The regularity and sophistication of the defendant's activities.

(B) The value and size of the inventory of stolen property maintained by the defendant.

(C) The extent to which the defendant's activities encouraged or facilitated other crimes.

(D) The defendant's past activities involving stolen property.

USSG § 2B1.1(b) cmt. n. 5.

This enhancement was clearly designed to apply to professional individuals who regularly engage in the buying and selling of stolen property. See United States v. St. Cyr, 977 F.2d 698, 703 (1st Cir. 1992) ("Where there is no indication either of a pattern of dealing in stolen property or of a developed operation that promises such consistency for the future, the defendant is unlikely to be 'in the business.'").

While Ms. Maclean did purchase human remains stolen by Mr. Lodge from his employment at the Harvard Morgue and sell some, something more is required for this enhancement to apply to her. Indeed, none of the relevant characteristics found in the application note apply to Ms. Maclean's conduct.[4] The lack of these and other factors demonstrates that Ms. Maclean's limited transactions with Lodge established that she was not

[4] Even if the enhancement applies, it would not change the advisory guideline range and would remain 0-6 months.

in the "business" for this enhancement to apply. Therefore, Ms. Maclean's objection should be sustained.

**II.**

**MS. MACLEAN'S OBJECTION TO ANY UPWARD DEPARTURE PURSUANT TO USSG § 5K2.8 SHOULD BE SUSTAINED**

Before a sentencing court may depart upward, proper notice must be provided to the defendant. See Fed. R. Crim. P. 32(h); USSG § 6A1.4. In most instances, reference to factors warranting a possible upward departed in a pre-sentence report is sufficient. See United States v. Queensborough, 227 F.3d 149 (3d Cir. 2000). However, to justify an upward departure, it must be based on valid factors. See Koon v. United States, 518 U.S. 81 (1996).

Here, Probation contends that USSG § 5K2.8 (Extreme Conduct) may warrant an upward variance. PSR ¶ 76. While Probation's passage in the PSR appears to satisfy the proper notice requirements, the reasons it relies upon under 5K2.8 to support it do not. That section states:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

USSG § 5K2.8.

Applying the plain language analysis, this section applies only to conduct inflicted or impacted on a live victim. It does not apply to human remains. Indeed, human remains are not "victims." See, e.g., United States v. Hess, 106 F.4th 1011, 1032 (10th Cir. 2024) (human remains of deceased victim would not qualify for "vulnerable victim" enhancement under USSG 3A1.1(b)); United States v. Shumway, 112 F.3d 1413, 1422-23 (10th Cir. 1997) (USSG 3A1.1 does not apply to prehistoric human skeletal remains finding that to interpret 'vulnerable victim' to include skeletal remains would stretch the imagination, and would render application of USSG § 3A1.1(b) potentially absurd."). Similarly, the next of kin or family members do not qualify as "victims" under this section to warrant application of this enhancement. See, e.g., Hess, 106 F.4th at 1032-33 (rejecting application of vulnerable victim enhancement for grieving family members).

Second, even under the theft and fraud guidelines, for which Ms. Maclean is exposed, a "victim" is defined as any "*person*" who sustained actual loss or any "*individual*" who sustained bodily injury. See USSG 2B1.1 cmt. n.1 (defining "victim") (emphasis added). Again, human remains do not meet the definition of a "victim."

Finally, an upward departure (or enhancement) is also not proper since the Government, who solely possessed the power and

authorization to indict, specifically chose to charge Ms. Maclean in an unusual and untested manner under the National Stolen Property Act. If it wanted a higher sentence, it would have indicted Ms. Maclean on Wire Fraud, Mail Fraud or the like that were filed in other comparable cases across the country.

Since the Government elects what charges to bring in the first instance, it picked the most appropriate charge, with full recognition of the likely applicable sentencing guidelines. This plainly suggests that the punishment in the aggravated range is inappropriate given the other charges were available and the Government did not even attempt to charge her with those offenses. See USSG Ch. 1, Pt. A, 4(a) ("a sentencing court may control any inappropriate manipulation of the indictment through use of its departure power."); United States v. Lieberman, 971 F.2d 989, 995 (3d Cir. 1992), abrogated on other grounds, United States v. Douglas, 885 F.3d 124 (3d Cir. 2018) (where prosecution charged defendant with tax evasion and embezzlement, knowing that they were not groupable, and other defendants not charged, court can depart to ensure government not manipulating sentence); United States v. Rahman, 189 F.3d 88, 157 (2d Cir. 1999) (district courts possess the ability to depart where guideline range lengthened by prosecutor's decision to add "essentially duplicative counts, each describing the same criminal conduct.").

## III.

## A NON-INCARCERATION SENTENCE IS WARRANTED PURSUANT TO THE SALIENT 18 U.S.C. § 3553(a) FACTORS

Largely as a result of the Supreme Court's sentencing pronouncements in Gall v. United States, 552 U.S. 38 (2007) and Kimbrough v. United States, 552 U.S. 85 (2007), the sentencing options available to district court judges have "significantly broadened." Gall at 552 U.S. at 59. Recognizing that the Guidelines are simply the "starting point" in a sentencing analysis, district courts must delve deeper, and make an "individualized assessment based on the facts presented." Gall, 552 U.S. at 50.

"In the wake of Booker, it is essential that district courts make an 'individualized assessment based on the facts presented.'" United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009) (en banc), citing Gall, 552 U.S. at 50. In formulating its sentence, "the court must consider all of the 18 U.S.C. § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines." Tomko, 562 F.3d at 567.[5]

[5] These factors are well-known: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) any pertinent policy statement; (6) the need to avoid

In Pepper v. United States, 562 U.S. 476, 487 (2011) the Supreme Court emphasized the need for individualized sentencing, reiterating "the principle that 'the punishment should fit the offender and *not merely the crime*." (emphasis added); see also Miller v. Alabama, 567 U.S. 460, 472 (2012) ("punishment for crime should be graduated and proportioned to both the offender and the offense.").

As such, "sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." United States v. Harris, 679 F.3d 1179, 1183 (9th Cir. 2012). Moreover, the nature of the crime or how a judge feels about a particular type of crime should not be dispositive. See United States v. Olhovsky, 562 F.3d 530, 549 (3d Cir. 2009) (remanding and noting that "the district court was so appalled by the offense that it lost sight of the offender.").

Accordingly, in engaging in an individualized sentencing scheme and the enumerated in 3553(a) factors, a non-incarceration punishment for Ms. Maclean is appropriate because it "fits the offender and not merely the crime." Pepper, 562 U.S. at 488.

---

unwarranted sentencing disparities; and, (7) the need to provide restitution. See 18 U.S.C. § 3553(a).

**A. The Advisory Guidelines.**

Unlike the vast majority of other cases coming before this Court, the applicable guideline provisions for this offense are extremely low. The total offense level is merely 4.[6] Ms. Maclean has no criminal history and her criminal history category is therefore category I. This combination produces an advisory guideline range of 0-6 months and will still fall within Zone A. Therefore, even if the Court chose to increase that level by as much as four levels to level 8, the guidelines would still result in an advisory guideline range of 0-6 months.[7]

**B. Ms. Maclean's History And Characteristics, And The Circumstances Of This Offense.**

As set forth above, the grave responsibility of sentencing an individual requires a sentencing judge to thoughtfully consider all relevant facts and circumstances of an individual's life story. "We have to conduct this searching inquiry into the criminal's life history, not to excuse, but to appreciate the conditions that inevitably attend and may lead to criminal behavior. Focusing on the individual offender is not part of

[6] The offense level reflects the seriousness of the offense under the Sentencing Guidelines. See USSG § 1B1.2(a); Chapter 5, cmt. and Part A.

[7] An increase above that would fall within Zone B. This would still authorize a non-incarceration sentence and permit a term of supervised release with a condition of home confinement. See USSG § 5C1.1(c)(1).

the problem of crime; it is part of the solution." Hon. David L. Bazelon, Questioning Authority: Justice and Criminal Law 27.

Indeed, the import of these factors are supported by statute. 18 U.S.C. § 3661 states that "*[n]o limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis added). The United States Sentencing Guidelines also encourage sentencing courts to "consider, *without limitation*, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4 (emphasis added).

Applying these criteria, there a myriad of factors that warrant a non-custodial sentence.

First, without minimizing the seriousness of the offense conduct and its impact on the family members affected, for which Ms. Maclean readily admits, a close review of the circumstances of the offense reveals that her involvement in this case was significantly distinct from the other participants in this case.

While Ms. Maclean was a participant in the so-called "oddities" community and the owner of Kat's Creepy Creations[8] in

[8] That business specialized in selling "creepy" dolls and oddities products.

Peabody, Massachusetts, a few miles from Salem, that business existed before meeting Mr. Lodge and did not involve any type of possession, use or sale of human remains. Prior to meeting Mr. Lodge, Ms. Maclean was not a collector or seller of human remains. She met Mr. Lodge at an oddities flea market where he approached her, told her where he worked and what items he could provide and gave her his business card. See Def.'s Ex. 1. Prior to meeting Mr. Lodge, Ms. Maclean never considered buying, selling or collecting human remains. The limited items that Ms. Maclean eventually purchased from Mr. Lodge were already used in the lab and heavily dissected prior to coming into her possession. Mr. Lodge was the sole individual who provided Ms. Maclean access to the morgue, where the human remains were kept, during working and non-working hours and who sold them to her. However, the occasions that Ms. Maclean went to the Harvard Morgue were merely tours, she never left with any human remains from those visits. The transactions themselves were done outside of Harvard.

Denise Lodge accompanied Mr. Lodge on most occasions. She was the individual who set the prices, orchestrated the sales and collected payment. She would often reach out to Ms. Maclean, acting as a sales representative for her husband to discuss available items. Mrs. Lodge regularly sold bones and

specimens openly on social media groups. Thus, the Lodges' role in the offense was primarily for profit.

By contrast, the majority of items recovered from Ms. Maclean's home and studio were kept and not sold. PSR ¶ 21. The items purchased and sold by Ms. Maclean were also limited. Ms. Maclean purchased two dissected faces from the Lodges for $600. PSR ¶ 17. That transaction occurred at Ms. Maclean's residence, not at Harvard. PSR ¶ 17. A similar transaction for human skin was also arranged by the Lodges. PSR ¶ 19. The total amount of items purchased from the Lodges was approximately $10,000. See Gov't Offense Conduct Statement.

Similarly, Ms. Maclean's conduct pales in comparison to that of Joshua Taylor.

Mr. Taylor was doing business with the Lodges for a few years longer than that of Ms. Maclean. Taylor was a business partner with Jeremy Pauley for years. In fact, he was Pauley's main supplier for years. Taylor sold to many different people over the years, while Ms. Maclean only sold to a few individuals. While Ms. Maclean did sell several items, the total amounted to approximately $8,000. PSR ¶ 19. By contrast, Mr. Taylor sold over $37,000 worth of human remains. Moreover, unlike Ms. Maclean, some of those items collected or sold by Mr. Taylor included fetal remains. It is also believed that even after these charges were filed, Taylor continued to buy, sell

and trade human remains. Ms. Maclean immediately and voluntarily ceased such behavior after her arrest.

To be clear, in no way is Ms. Maclean justifying her conduct. She knows it was wrong, undignified and insensitive. She expects to be, and in fact will be, punished. Here, she seeks simply to explain her conduct and have it evaluated in a fair and balanced manner.

Second, Ms. Maclean immediately cooperated with law enforcement at the time of the execution of the search warrant at her home. She provided uncounseled admissions, disclosed specific details regarding her involvement in the transactions, how the crimes were accomplished and gave access to her business and other items to the FBI. She even executed a proffer agreement; however, the Government ultimately did not elect to meet with her. This level of cooperation, from the very beginning of the case, even though the Government chose not to file a substantial assistance motion, should be recognized by the Court in support of a variance. See Roberts v. United States, 445 U.S. 552, 558 (1980) (defendant's cooperation demonstrates that the "defendant will transgress no more [and will] respond to rehabilitative efforts [and] not deem himself at war with his society."); United States v. Landron-Class, 696 F.3d 62, 77 (1st Cir. 2012) (joining other circuits "sensibly holding that, in determining the appropriate sentence within the

guidelines, or varying from the guidelines, a sentencing court has discretion to consider the defendant's cooperation with the government as a § 3553(a) factor, even though the government has not made a USSG § 5K1.1 motion for a downward departure."); United States v. Ruff, 535 F.3d 999 (9th Cir. 2008) (finding sentence of one day not unreasonable where defendant embezzled more than $650,000 from a non-profit organization and where guidelines were 30-37 months, in part because his cooperation with agents as to the howe the crime was accomplished.).

Third, Ms. Maclean is 47 years old. She is happily married and is the loving mother of a 16-year-old son and 10-year-old daughter. She is a devoted stay-at-home mom. Any incarceration for Ms. Maclean would have a harsh and devastating impact on her children who rely and depend on her as their primary caregiver in the family. The Court should consider her family responsibilities and the impact the sentence will have on her innocent third party family members. See United States v. Dominguez, 296 F.3d 192 (3d Cir. 2002) (in bank fraud case, district court erred in holding it could not depart downward four levels for defendant who resided with elderly parents and who were physically and financially dependent on defendant); United States v. Husein, 478 F.3d 318 (6th Cir. 2007) (district court did not abuse discretion in departing downward on the basis of family circumstances finding that the defendant was

"irreplaceable" to her family); United States v. Bueno, 549 F.3d 1176 (8th Cir. 2008) (where defendant possessed more than 70 kilos of cocaine and guidelines 108-135 months, sentence of probation with house arrest for five years not unreasonable given family's dependence on defendant); see also, Annie E. Casey Foundation, A Shared Sentence, The Devastating Toll of Parental Incarceration on Kids, Families and Communities, Apr. 18, 2016, available at, http://www.aecf.org/resources/a-shared-sentence/.

Third, as referenced in the attached character letters, notwithstanding these events, Ms. Maclean's family and friends hold her in the highest regard and remain incredibly supportive of her. They describe her as "empathetic," "kind," and "supportive," and a "good and decent person," among other things. Def.'s Ex. 2 (character letters). These letters provide insight to Ms. Maclean and tell a markedly different story of the woman who pleaded guilty to the criminal charge.

Fourth, Ms. Maclean has no criminal history of any kind. This fact, by itself, warrants a variance. See 28 U.S.C. § 994(j) (statute which charges the Sentencing Commission with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious

offense."); United States v. Autery, 555 F.3d 864, 874 (9th Cir. 2009) (district court's sua sponte variance to probation where guidelines 41-51 months was not unreasonable because it was defendant's first conviction and criminal history level I "did not fully account for his *complete lack of criminal history*" because a defendant with minor criminal history still falls in category I) (emphasis added).

Fifth, the length of time until Ms. Maclean's first (and only) criminal conduct (47 years old at the time of her conviction and 44 years old at time of offense conduct) likewise merits a variance. See United States v. Smith, 275 F. App'x 184 (4th Cir. 2008) (where guidelines 78-97 months, sentence of 24 months not abuse of discretion where district court noted defendant was 64 years of age and had "avoided violations of the law up until this point in his life."); United States v. Hanson, 561 F. Supp. 2d 1004 (E.D. Wisc. 2008) (where guidelines in child porn case 210-262 months, court imposes 72 months in part because defendant was 49 years old and "had no prior record whatsoever" and "he had never before been to jail for even one day."); United States v. Ward, 814 F. Supp. 23 (E.D. Va. 1993) (departure warranted for 49 year old defendant because guidelines fail to consider length of time defendant refrains from commission of first offense).

Sixth, these events have had a profound and traumatizing impact for Ms. Maclean. She was diagnosed with "severe anxiety, significant depression and posttraumatic stress disorder." Def.'s Ex. 3 (letter from Dr. Gani, dated July 14, 2023). Her mental and emotional state should be considered in support of a variance. See United States v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006) (in $500,000 embezzlement case, no abuse in discretion for district court to depart downward by 8 levels to probation in part because of defendant's post-traumatic stress syndrome). Ms. Maclean continues to struggle with that condition and has sought the help of a counselor.

Seventh, "the touchstone of extraordinary rehabilitation is a fundamental change in attitude." United States v. Craven, 239 F.3d 91, 100 (1st Cir. 2001). Ms. Maclean has demonstrated sincere remorse for her actions and commenced therapeutic counseling at the outset of this case. She has seen a therapist, Shelley Holloway, weekly since July 2023. According to Ms. Holloway, Ms. Maclean has struggled with "tormenting guilt and shame" for the harm she has caused by her behavior. See Def.'s Ex. 4 (Holloway letter). According to her therapist, Ms. Maclean has demonstrated a "consistent commitment to therapy" and "active engagement in treatment." Id. Ms. Holloway also opined that given her experience and working with Ms. Maclean for the past several years, her risk of recidivism

is "very low." Id. Ms. Maclean is clearly not the same person she was at the time of committing this offense.

Because of her laudable post-offense rehabilitative efforts, a variance is warranted. See, e.g., Gall v. United States, 552 U.S. 38 (2007) (in conspiracy to distribute large quantities of drugs, variance from guidelines to a probationary sentence was reasonable in part because of defendant's self-rehabilitation which shows "imprisonment not necessary to deter Gall from engaging in future criminal conduct or to protect the public from future criminal acts."); United States v. Martin, 520 F.3d 87, 93-94 (1st Cir. 2008) (where defendant convicted of distribution of crack and was career offender and guidelines were 235-293 months, court's downward variance to 144 months was reasonable in part because of defendant's efforts at rehabilitation stating that "a founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence . . . ."); United States v. Clay, 483 F.3d 739 (11th Cir. 2007) (finding reasonable variance from 188-235 to 60 months because of post offense rehabilitation and recognizing "considerations of post offense rehabilitation are appropriate when a district court evaluates the history and characteristics of the defendant and the need to protect the public from future crimes.").

**C. The Goals Of Punishment And Adequate Deterrence.**

As the Court is aware, Section 3553(a) requires that the sentence imposed provides just punishment for the offense, adequately deter future criminal conduct, and protect the public from further crimes by the defendant. See 18 U.S.C. § 3553(a)(2). Here, a non-custodial sentence achieves all of these goals.

First, the likelihood that a defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." Pepper v. United States, 562 U.S. 476, 492 (2011).

Given Ms. Maclean's age (47) and the opinion of her mental health professional, her likelihood of recidivism is extremely low and should be considered for a variance. See United States v. Payton, 754 F.3d 375 (6th Cir. 2014) (recognizing that recidivism rates decline as age increases and defendant convicted of bank robbery and guidelines call for 20-year sentencing range, court's sentence in excess of that was unreasonable because court did not consider that recidivism greatly decreases with age, citing Sentencing Commission reports); U.S. Sent. Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 12 (2004), available at, https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2004/200405 Recidivism Criminal History.pdf; (finding "recidivism rates decline relatively consistently as age increases" from 35.5% under age 21 to 9.5% over 50).

Second, courts have recognized that first-time offenders like Ms. Maclean are statistically less-likely to reoffend. See United States v. Williams, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming below guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism.").

Moreover, offenders like Ms. Maclean who have never been imprisoned, even a short term of imprisonment can be "sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances." United States v. Cull, 446 F. Supp. 2d 961, 965 (E.D. Wisc. 2006).

Third, probation or house arrest, is by itself a substantial punishment, particularly for a first-time offender like Ms. Maclean. See Gall v. United States, 552 U.S. 38 (2007) (finding that probation is a "substantial restriction of freedom."); United States v. Edwards, 595 F.3d 1004, 1016 n.9 (9th Cir. 2010) (quoting Senate report noting "[i]t may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose.");

United States v. Bueno, 549 F.3d 1176 (8th Cir. 2008) (in drug case where guidelines 108-135 months, sentence of probation with house arrest for five years not unreasonable under circumstances).

Fourth, there is no basis to equate that a higher quantity of punishment will result in increased deterrence and decreased criminal activity. There is simply no empirical data which supports the theory that a sentence length deters future crime. See Michael Tonry, Purposes and Functions of Sentencing: A Review of Research, 34 Crime & Just. 1, 28-29 (2006) (citing three National Academy of Science panels). The Sentencing Commission has also found that "[t]here is no correlation between recidivism and Guideline offense levels. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent. Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (Feb. 10, 2012); see also United States v. Craig, 703 F.3d 1001, 1003 (7th Cir. 2012) (Posner, J., concurring) (Judge Posner reminding district court judges of the importance of careful consideration of the wisdom of lengthy sentences citing to the costs of maintaining a federal prisoner, a prisoner's age, and the limited deterrent impact on long sentences). Even the Department of Justice has determined in its own studies that both prison sentences in

general and increasing the severity of punishment does not deter crime. See U.S. Dep't of Justice, Office of Justice Programs, National Institute of Justice, Five Things About Deterrence (July 2014).

Finally, even though the criminal episode originated in the Commonwealth of Massachusetts, no state charges were ever brought there. Instead, the federal government elected to pursue this prosecution. The reason for this seems clear: even though Massachusetts has penal laws prohibiting the conduct in question, its penalties are minimal and do not mandate a jail sentence. See Mass. Gen. Laws Ch. 272, § 72 (state law prohibiting the buying, selling or trafficking of dead body is a misdemeanor punishable either by fine of $50 up to $1,000 *or imprisonment* for not less than 3 months nor up to 2 ½ years) (emphasis added). This disparity between the state and federal prosecution and sentences, deserves consideration by this Court when fashioning its sentence. See United States v. Biheiri, 356 F. Supp. 2d 589 (E.D. Va. 2005) (noting "the obvious and well-publicized disparities in sentences imposed in the federal and state systems"); United States v. Moreland, 366 F. Supp. 2d 416, 423 (S.D. W.Va.) (court varies and gives non-guideline sentence noting that the case was "a perfect example of the vast disparities that can exist between the

state and federal criminal justice system."), remanded because of extent of departure, 437 F.3d 324 (4th Cir. 2006).

**CONCLUSION**

For all of the foregoing reasons, Ms. Maclean respectfully submits that a non-incarceration sentence is sufficient, but not greater than necessary, to comply with the statutory directives of 18 U.S.C. § 3553(a).

Dated: August 15, 2026

MIELE & RYMSZA, P.C.

By: s/Edward J. Rymsza
Edward J. Rymsza, Esq.
Pa. I.D. No. 82911
Attorney for Defendant
125 East Third Street
Williamsport, PA 17701
(570) 322-2113
(570) 322-8813 (facsimile)
rymsza@comcast.net

**CERTIFICATE OF SERVICE**

I, Edward J. Rymsza, Esq., hereby certify that on this 15th day of August 2026, I served the foregoing Sentencing Memorandum and Memorandum in Support of Objections to the Pre-Sentence Report upon Alisan Martin, Esq. by electronic mail.

Dated: August 15, 2026

MIELE & RYMSZA, P.C.

By: s/Edward J. Rymsza

Edward J. Rymsza, Esq.
Pa. I.D. No. 82911
Attorney for Defendant
125 East Third Street
Williamsport, PA 17701
(570) 322-2113
(570) 322-8813 (facsimile)
rymsza@comcast.net